[Cite as *Irvin v. Eichenberger*, 2017-Ohio-5601.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Maxine C. Irvin, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-657 |
| v. | : | (C.P.C. No. 14DR-4674) |
| Raymond L. Eichenberger, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 29, 2017

**On brief:** *Petroff Law Offices, LLC*, and *Erika M. Smitherman*, for appellee. **Argued:** *Erika M. Smitherman.*

**On brief:** *Raymond L. Eichenberger*, pro se. **Argued:** *Raymond L. Eichenberger.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BRUNNER, J.

{¶ 1} Defendant-appellant, Raymond L. Eichenberger, appeals a divorce decree issued on September 7, 2016 by the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, by which the trial court granted a divorce to plaintiff-appellee, Maxine C. Irvin and equitably divided the couple's assets. For the reasons that follow, we reverse in part and affirm in part the trial court's decision, and we remand the matter to the trial court for proceedings consistent with this decision.

## I. FACTS AND PROCEDURAL HISTORY[1]

{¶ 2} On December 30, 2014, Irvin filed with the Domestic Relations Court a complaint for divorce with minor children (specifically, one child, a daughter, who was

---

[1] Owing to the fact that Eichenberger argues 13 assignments of error regarding a variety of topics, a lengthy recitation of the case history is required.

No. 16AP-657

almost 17 years old at the time of the complaint) against Eichenberger. (Dec. 30, 2014 Compl.) Irvin simultaneously filed a motion for exclusive use of the home that her family occupied based on the allegations that she purchased the home (a house located at 4981 Pegasus Court) before the marriage and Eichenberger had never contributed to the mortgage payments or household expenses during the marriage. (Dec. 30, 2014 Mot. for Beneficial Use at 2.) On February 6, 2015, Eichenberger counterclaimed for divorce. (Feb. 6, 2015 Answer & Counterclaim.) He also sought beneficial (but non-exclusive) use of the residence on Pegasus Court. (Feb. 9, 2015 Mot. for Beneficial Use at 2.) Both sides sought and received temporary restraining orders forbidding a number of things including harassment of each other and diminishment or encumbrance of assets. (Dec. 31, 2014 Restraining Order; Feb. 9, 2015 Temporary Restraining Order.)

{¶ 3} Approximately two weeks later, the trial court denied Irvin's motion for exclusive use of the Pegasus residence reasoning that:

> [T]o be successful on her motion and have Defendant ordered to vacate the marital residence, Plaintiff credibly must prove that she has been subject to physical violence by Defendant, that Defendant poses a credible threat of imminent physical violence to her, or that Defendant has or will be destructive to the parties' real or personal property if allowed to remain in the residence.

(Feb. 19, 2015 Mag. Order at 1.) As a consequence, both parties continued to reside together at 4981 Pegasus Court.

{¶ 4} On March 3, 2015, Irvin sought temporary orders for child support and spousal support to ensure that Eichenberger would contribute to household expenses while living at the Pegasus house (which he had never done during the course of the marriage). (Mar. 3, 2015 Irvin Aff. in Support of Temporary Orders.) The same day, Eichenberger argued against temporary orders for support on the grounds that he was without resources to meet the amounts sought by Irvin. (Mar. 3, 2015 Eichenberger Aff. Contra Mot. for Temporary Orders.) One week later, the trial court issued a temporary order requiring an equal division of household and child-rearing expenses. (Mar. 10, 2015 Mag. Order.) Eichenberger objected. (Mar. 17, 2015 Objs.; *see also* May 29, 2015 Order (converting objections into a Civ.R. 75 request for a hearing).)

{¶ 5} At approximately 2:36 p.m. on March 20, 2015, Eichenberger moved to compel discovery of a number of items including the recent text messages of Irvin.

No. 16AP-657

(Mar. 20, 2015 Mot. to Compel.)  Attached to his motion was a letter allegedly sent by Eichenberger to Irvin's counsel on March 17, 2015.  (Mar. 20, 2015 Mot. to Compel (see attachment).)  The letter threatened a motion to compel in the event Irvin failed to produce the requested discovery by the end of the day on March 20.  *Id.*  On April 1, 2015, Irvin filed in opposition to Eichenberger's motion and sought attorney fees against him, alleging that Eichenberger had not, in fact, made contact with Irvin's counsel in an effort to resolve the dispute before filing his motion to compel.  (Apr. 1, 2015 Memo. in Opp. at 4-5.)  Eichenberger replied two days later asserting that he had mailed the attached letter on March 17, 2015 and, therefore, had complied with the rules before filing a motion to compel.  (Apr. 3, 2015 Reply in Support of Mot. to Compel.)

{¶ 6}  On April 17, 2015, Eichenberger filed a motion for temporary custody of the couple's 17-year-old daughter (who already lived with both parents at the house on Pegasus Court).  (Apr. 17, 2015 Mot. for Temporary Custody.)  The motion alleged that Irvin had engaged in a "systematic and heinous plan" to poison the mind of their daughter against Eichenberger with the result that the daughter refused to engage in activities with Eichenberger; for example, she had refused to allow him to accompany her on college visits.  *Id.* at 2.  One week later, the trial court denied Eichenberger's motion but ordered the couple's daughter attend counseling with Eichenberger.  (Apr. 27, 2015 Entry.)

{¶ 7}  Shortly after Eichenberger filed his motion for custody, but before the trial court ruled on it, Irvin filed a motion to compel production of discovery items and attached an email sent to Eichenberger on March 30, 2015 requesting the production of late discovery materials and asserting that a motion to compel would be filed if the materials were not produced.  (Apr. 20, 2015 Mot. to Compel.)  The same day Irvin also filed a motion to hold Eichenberger in contempt for his failure to pay his court-ordered share of the household and child-rearing expenses as well as for his harassing behavior toward Irvin.  (Apr. 20, 2015 Mot. for Contempt at 2-3.)  Attached to the motion were a number of e-mails from Eichenberger to Irvin evidencing his refusal to pay expenses and threatening, among other things, motions for contempt against Irvin to force her to make their teenage daughter treat Eichenberger with more respect.  (Exs. B, D, Apr. 20, 2015 Mot. for Contempt.)  Eichenberger opposed the contempt and demanded attorney fees in connection with the motion to compel.  (Apr. 23, 2015 Memo Contra Mot. to Compel.)

{¶ 8} On June 4, 2015, a magistrate of the trial court ruled on the motions to compel. Although a record of the hearing was not preserved for review, the magistrate's order recounted that the magistrate met twice with the parties in an attempt to resolve their discovery issues. (June 4, 2015 Mag. Order at 1.) Eichenberger requested a continuance due to the fact that he had an appointment scheduled with a client at 11 a.m. *Id.* Rather than immediately grant the continuance, the magistrate judge recessed for ten minutes to allow the parties time for further discussion with the instruction that it would reconvene to decide if the matter would be heard or continued. *Id.* However, Eichenberger did not return ten minutes later, did not notify court personnel where he would be or where he was going, and appeared to be nowhere on the floor. *Id.* After delaying for a further 40 minutes, the magistrate reconvened, dismissed Eichenberger's motion to compel, and granted Irvin's motion to compel, identifying in considerable detail the information Eichenberger was ordered to produce. *Id.* at 2-5.

{¶ 9} Eight days later, on June 12, 2015, Eichenberger objected to the magistrate's order. (June 12, 2015 Objs.) He alleged that he went to the Franklin County Law Library to review documents and cancel his 11 a.m. appointment but when he returned at 11:40 a.m., the magistrate and the other side had proceeded in his absence and were gone. *Id.* at 2.

{¶ 10} On June 22, 2015, Eichenberger filed an affidavit in support of his March 17, 2015 objections (which were later construed as a request under Ohio Rule of Civil Procedure 75) seeking relief from the obligation to pay 50 percent of the household and child-rearing expenses due to financial hardship. (June 22, 2015 Eichenberger Aff.) Simultaneously, he filed a motion to hold Irvin in contempt for using diminishing marital funds by having landscaping work done at the Pegasus house and replacing a broken air-conditioner at a total cost of $7,364. (June 22, 2015 Mot. for Contempt (later withdrawn on August 31, 2015).)

{¶ 11} The next day, June 23, Irvin filed an affidavit explaining why, in her view, the temporary orders mandating payments from Eichenberger for a share of the household expenses should remain in place. (June 23, 2015 Irvin Aff.) She alleged in her affidavit that Eichenberger was hiding assets and had been spending frivolously on activities like golf rather than meeting his court-ordered obligations. *Id.* at 4-6. She also

No. 16AP-657

stated that Eichenberger had opened a credit card in her name and had run up a balance on the card and refused to make payments. *Id.* at 7-9.

{¶ 12} On July 10, 2015, following a July 7, 2015 hearing, the magistrate issued two orders, one of which resulted from agreement of the parties. (July 7, 2015 Hearing Tr., filed Jan. 27, 2016.) The agreed order included language that Eichenberger owed Irvin his share of household expenses, setting his share at $490 per month from December 30, 2014 until July 31, 2015 and offsetting any unpaid accrued amount against Eichenberger's ultimate share of the marital property. (July 10, 2015 Agreed Mag. Order at 1-2.). From August 1, 2015 until the date of the final decree, Eichenberger was ordered to pay to Irvin $200 in cash on the first of each month with the remaining $290 of his monthly expense obligation to be offset against Eichenberger's final share of the assets. *Id.* The other July 10 order required Eichenberger to pay $133 per month on debts associated with the credit card Eichenberger had opened in Irvin's name without her consent. (July 10, 2015 Mag. Order.)

{¶ 13} On August 11, 2015, the trial court overruled Eichenberger's June 12, 2015 objections to the June 4 magistrate's order dismissing his motion to compel and granted Irvin's motion to compel. (Aug. 11, 2015 Entry on Objs.) Eichenberger had not obtained a record of the proceedings to support his objections pursuant to Civ.R. 53, arguing that no transcript was obtainable despite the magistrate's notation in her order that a record was made of the proceedings. *Id.* at 2.

{¶ 14} Two weeks later, Irvin filed a motion to hold Eichenberger in contempt based on his noncompliance with the June 4, 2015 order compelling production of various records and failure to make payments as required by the July 10, 2015 orders. (Aug. 26, 2015 Mot. for Contempt.) Irvin also requested that Eichenberger pay attorney fees incurred in connection with opposing Eichenberger's objections to the June 4, 2015 order on the grounds that the objections (which had been unsupported by a transcript or any appropriate Civ.R. 53 record) were baseless. (Aug. 26, 2015 Mot. for Fees.)

{¶ 15} Two days later, on August 28, 2015, Eichenberger moved for relief from the July 10, 2015 agreed entry. (Aug. 28, 2015 Mot. for Relief from Jgmt.) He argued that at the time he agreed to pay $490 per month for household expenses, he had been unaware that the magistrate was intending to issue an order requiring him to pay $133 per month

No. 16AP-657

toward the credit card bill and that, had he been aware, he would not have agreed to the entry on household expenses. *Id.* at 2-3. To explain the delay in his request for relief, he asserted that an error in the docketing text mislabeled both orders as agreed orders and, assuming them to be duplicates of each other, he had not read the second July 10 order.[2] *Id.* at 2.

{¶ 16} Three days later, Eichenberger filed a notice of appeal. (Aug. 31, 2015 Notice of Appeal.) On October 8, 2015, this Court dismissed his appeal for want of a final, appealable order. (Oct. 8, 2015 Dismissal.) We subsequently denied Eichenberger's motions for reconsideration and to certify a conflict. *Irvin v. Eichenberger*, 10th Dist. No. 15AP-824, 2015-Ohio-4400. Eichenberger sought further relief in the Supreme Court of Ohio but that Court ultimately declined jurisdiction. (Oct. 27, 2015 Notice of Appeal; Jan. 20, 2016 Entry Declining Jurisdiction.)

{¶ 17} Eleven days following our dismissal of Eichenberger's appeal, the trial court ruled and entered judgment on Irvin's April 20, 2015 contempt motion. (Oct. 19, 2015 Entry & Decision.) Finding that Eichenberger had violated the prior restraining orders mutually ordering the parties to refrain from insulting, disparaging, or harassing each other, the trial court ordered him to serve three days in jail. *Id.* at 2-3. It held that he could purge his contempt, however, by, among other things, ceasing to speak to or in the presence of Irvin except about the case in formal court proceedings or through her attorney. *Id.* at 3-4.

{¶ 18} Three days later, Irvin filed a second motion for exclusive use of the house at 4981 Pegasus Court. (Oct. 22, 2015 Mot. for Beneficial Use.) The following day, on October 23, 2015, the trial court held a hearing, which Eichenberger (despite signing the last continuance of the hearing on which this October 23 date was noted) did not attend. (Oct. 23, 2015 Hearing Tr., filed Jan. 22, 2016; Sept. 3, 2015 Continuance.) At the hearing, by entry dated October 26, 2015, the magistrate awarded attorney fees to Irvin in the amount of $1,500 associated with Eichenberger's attempt to object to the magistrate's June 4, 2015 order without a transcript. (Oct. 26, 2015 Mag. Order on Fees.) At the same hearing, because Eichenberger did not appear to prosecute his motion for relief from

---

[2] Review of the public docket reveals that indeed this mislabeling error is present. However, the page count for the two documents is different and that difference is also apparent from the docket.

No. 16AP-657

judgment, the trial court denied Eichenberger's motion for relief from the July 10 agreed order of the magistrate. (Oct. 27, 2015 Decision & Entry at 1; *see also* Aug. 28, 2015 Mot. for Relief from Jgmt.; July 10, 2015 Agreed Mag. Order.)

{¶ 19} Eichenberger responded on October 28, 2015, by immediately refiling the motion for relief from judgment with respect to the July 10, 2015 order on credit card payments. (Oct. 28, 2015 Mot. for Relief from Jgmt.) At approximately the same time, on October 26, 2015 (which was nearly six months after the initial counseling order), Eichenberger filed a motion for contempt against Irvin based on Irvin's failure to force their 17-year-old daughter to attend counseling sessions with Eichenberger. (Oct. 26, 2015 Mot. for Contempt.) On October 30, 2015, Eichenberger filed objections to the magistrate's decision of October 19, 2015 finding him in contempt. (Oct. 30, 2015 Objs.) And on November 6, 2015, Eichenberger objected to the magistrate's order that he pay attorney fees to Irvin. (Nov. 6, 2015 Objs.) The same day, Eichenberger filed a new motion to compel discovery against Irvin to discover information regarding complaints potentially filed by Irvin against Eichenberger with the Columbus Bar Association. (Nov. 6, 2015 Mot. to Compel.)

{¶ 20} On November 30, 2015, Eichenberger attempted to quash service because a process server served him inside the house on Pegasus Court after Irvin let the process server into the house. (Nov. 30, 2015 Mot. to Quash at 2; Dec. 2, 2015 Entry at 1-2.) On December 2, 2015, the trial court denied the motion to quash and also Eichenberger's refiled motion for relief from judgment, calling Eichenberger's persistent filings frivolous. (Dec. 2, 2015 Entry at 2.)

{¶ 21} Near that point in time, the magistrate of the trial court held a hearing regarding beneficial use of the home and Eichenberger's latest motion to compel. (Dec. 1, 2015 Hearing Tr., filed Jan. 22, 2016.) On December 7, 2015 following that hearing, the magistrate and trial court ordered Eichenberger to vacate the Pegasus Court residence noting the deteriorating relationship between him and his daughter but granted him a $50,000 advance on the ultimate division of property via a qualified domestic relations

No. 16AP-657

order ("QDRO") to enable him to afford other housing.[3] (Dec. 7, 2015 Decision & Entry at 3-4.) The court ordered Eichenberger to continue to meet the credit card debt payments of $133 per month as well as half of all expenses for his daughter. *Id.* at 4-5. The trial court denied Eichenberger's motion to compel discovery. *Id.* at 5. One week later, Eichenberger again filed objections. (Dec. 14, 2015 Objs.)

{¶ 22} In December 2015, Eichenberger also engaged in litigation to attempt to have the trial judge disqualified from hearing his case. On December 9, 2015, Eichenberger filed an affidavit with the Supreme Court seeking to disqualify the trial judge. (Dec. 9, 2015 Disqualification Aff., filed Dec. 16, 2015.) When that was denied two days later, Eichenberger amended his affidavit and tried again. (Dec. 11, 2015 Jgmt. Entry, filed Dec. 16, 2015; Dec. 15, 2015 Am. Disqualification Aff., filed Dec. 21, 2015.) This attempt was denied by the Supreme Court on December 30, 2015. (Dec. 30, 2015 Jgmt. Entry, filed Jan 4, 2016.)

{¶ 23} On January 22, 2016, the trial court overruled Eichenberger's objections to the magistrate's decision finding him in contempt and ordering him to pay $1,500 in attorney fees to Irvin. (Jan 22, 2016 Entry.) The trial court also noted Irvin's retroactive withdrawal of her April 20, 2015 motion for contempt regarding Eichenberger's harassment within the home on Pegasus Court and thus struck the finding of contempt made on October 19, 2015. *Id.*; Apr. 20, 2015 Mot. for Contempt; Oct. 19, 2015 Entry & Decision. In the same entry, the trial court vacated orders regarding the minor child as the child had, by then, attained the age of majority. (Jan 22, 2016 Entry at 2.) Notwithstanding the child's attainment of majority, on February 4, 2016, the trial court overruled Eichenberger's objections to the order requiring him to move out of the house on Pegasus Court. (Feb. 4, 2016 Entry at 1-2.) In the course of that order, the court also noted that Eichenberger had simply walked out of the last hearing before it was over, summarily found him in direct contempt, and fined him $500. *Id.* at 2-3.

{¶ 24} On February 16, 2016, Irvin gave notice that her counsel had hand delivered trial materials including a witness list to Eichenberger. (Feb. 16, 2016 Notice.) The same

---

[3] The actual QDRO itself did not issue until February 24, 2016, which apparently resulted in part from changes to the order proposed by Eichenberger that would have significantly increased the cost of the QDRO. (Feb. 24, 2016 QDRO; Feb. 23, 2016 Tr. Vol. II at 176-79, filed Oct. 28, 2016.)

No. 16AP-657

day, Irvin moved the court for an order requiring Eichenberger to pay for all of her attorney fees, claiming as a basis Eichenberger's allegedly frivolous and litigious conduct. (Feb. 16, 2016 Mot. for Fees.) The next day, Irvin filed a witness list with the trial court. (Feb. 17, 2016 Witness List.) Eichenberger never created or shared a witness list with either Irvin or the trial court. (Feb. 23, 2016 Tr. Vol. III at 307.)

{¶ 25} The same day Irvin filed her witness list, the trial court issued a magistrate's decision and entry based on a hearing that had occurred on December 15, 2015. Though the transcript of the December hearing has not been produced in the record, the summary set forth in the February 17, 2016 entry and decision recounts that the hearing concerned Irvin's and Eichenberger's motions for contempt filed on August 26 and October 26, 2015, respectively. (Feb. 17, 2016 Decision & Entry at 2.) Based on evidence produced during the December 15, 2015 hearing, the trial court concluded in its February 17, 2016 decision and entry that Eichenberger had not complied with the June 4, 2015 order compelling him to properly answer discovery requests from Irvin. *Id.* at 3. He was again ordered to serve three days in jail for contempt but given opportunity to purge the contempt if, on or before February 22, 2016 at 10 a.m., he paid $600 to Irvin to cover her fees and costs (which could be satisfied through an offset against his final distribution) and appropriately responded to discovery by addressing every document identified in the prior order and producing that which was within his possession and control. *Id.* The trial court in its decision also found that Eichenberger had made no effort to make even partial payments satisfying the $133 per month that he was ordered to pay toward the credit card balance he had created in Irvin's name. *Id.* at 4. The trial court ordered him to serve three additional days in jail with respect to this contempt unless, at the time of the divorce, he paid Irvin (or provided her with an offset) of $600 in fees and the total outstanding balance owed as a result of the temporary orders. *Id.* The trial court in its order finally observed that the previous order requiring the minor child to attend counseling did not place the burden to ensure that counseling transpired upon Irvin. *Id.* at 4-5. Thus, it refused to find Irvin in contempt for the daughter's failure to cooperate in counseling. *Id.*

{¶ 26} Less than one week later, on February 23, 2016, trial commenced. On the first day of trial, Eichenberger objected to what he maintained was late disclosure of

No. 16AP-657

Irvin's expert witness and requested a continuance. (Feb. 23, 2016 Tr. Vol. I at 5-13, 19-20.) The trial court denied the continuance and declined to prohibit Irvin's expert from testifying. *Id.* Four witnesses ultimately testified at trial. Irvin testified on her own behalf and called two experts, a forensic accountant and an appraiser.[4] On behalf of Eichenberger, only Eichenberger testified.

{¶ 27} The first witness to testify was the forensic accountant. (Feb. 23, 2016 Tr. Vol. I at 20-21.) She testified about the assets and debts of both parties. Although she was not permitted by the trial court to testify about the value of the house, the appraiser testified that its value was $135,000, and the forensic accountant relied on that figure in making her calculations. (Feb. 23, 2016 Tr. Vol. III at 321-22; Pl.'s Ex. 3 at 1.) Taking into account the outstanding loan balance on the property, she calculated a total equity of $114,985 of which $33,010 was the separate property of Irvin. (Feb. 23, 2016 Tr. Vol. I at 35, 42; Pl.'s Ex. 3 at 1.) The forensic accountant was permitted to testify about the value of the cars (one owned solely by Irvin and one owned solely by Eichenberger) using NADA trade-in figures and valued those at $5,925 and $3,400, respectively. (Feb. 23, 2016 Tr. Vol. I at 43; Pl.'s Ex. 3 at 1.)

{¶ 28} The forensic accountant presented evidence that Eichenberger had a coin collection, a baseball card collection, a PNC account, a PNC safe deposit box, a PayPal account, an irrevocable living trust, a revocable living trust, a potential interest in a trust maintained by his mother, and two closely held businesses, Red Foot Racing Stables, LLC and his law practice. (Feb. 23, 2016 Tr. Vol. I at 42, 84-88; Pl.'s Ex. 3 at 1, 3.) But because Eichenberger had not cooperated in disclosing records sufficient to value any of these assets, she had not been able to use them in calculating assets of the parties. (Feb. 23, 2016 Tr. Vol. I at 42-43, 84-88; Pl.'s Ex. 3 at 1, 3.) Ignoring these assets but taking into account the $50,000 QDRO already ordered, she valued Eichenberger's separate property at a negative $2,113 and his share of marital property at $63,148. (Feb. 23, 2016 Tr. Vol. I at 99; Pl.'s Ex. 3 at 4.) The forensic accountant also testified to evidence of $1,246 in expenditures by Eichenberger on golf packages and some $19,881 in discretionary non-

---

[4] The appraiser testified to the appraised value of the Pegasus residence, which is not in dispute in this appeal, and details of his appraisal and supporting testimony are unnecessary in recounting the background to this appeal and decision.

business expenditures from Red Foot Racing Stables suggesting financial misconduct by Eichenberger. (Feb. 23, 2016 Tr. Vol. I at 99-105; Pl.'s Ex. 3 at 4.) She also noted in her testimony Eichenberger's obligations of $2,700 in attorney fees already ordered by the trial court and the $7,742 in unpaid temporary orders. (Feb. 23, 2016 Tr. Vol. I at 106-08; Pl.'s Ex. 3 at 4.)

{¶ 29} The forensic accountant testified she was able to value Irvin's assets and liabilities. The assets included the house, four retirement accounts (Scotts Fidelity 401(k), Cardinal Health Wells Fargo 401(k), Merrill Lynch IRA, and Merrill Lynch Brokerage), and three bank accounts with U.S. Bank, Union Savings Bank, and Scotts Associates Credit Union. (Feb. 23, 2016 Tr. Vol. I at 45-47, 56-72; Pl.'s Ex. 3 at 2-3.) The accountant testified that she valued the separate property versus marital property of the retirement accounts by looking at the balance before the marriage, calculating percentages for separate and marital property by comparing the pre-marriage balance to contributions during the marriage, and then applying those respective percentages to the market-adjusted value of the entire account. (Feb. 23, 2016 Tr. Vol. I at 61-72.) The liabilities of Irvin consisted of a number of credit cards, all of which were considered to be marital debts. (Feb. 23, 2016 Tr. Vol. I at 88-94; Pl.'s Ex. 3 at 4.) Computing net amounts, the expert calculated that Irvin had separate property of $149,938 and her share of the marital property was $309,842. (Feb. 23, 2016 Tr. Vol. I at 99.)

{¶ 30} The expert testified that she had not placed a calculation of an equal division of marital assets in her spreadsheet. (Feb. 23, 2016 Tr. Vol. I at 127-28.) She testified that if the trial court were to make an equal (rather than equitable) distribution based on the assets disclosed, the consequence would be a transfer from Irvin to Eichenberger of $126,468. *Id.*

{¶ 31} Irvin testified next (and was also recalled a number of times throughout the trial). Irvin factually agreed with the testimony of her expert on all substantial issues. Of particular relevance to this appeal, she testified that she bought the house at 4981 Pegasus Court, prior to her marriage to Eichenberger and had paid 100 percent of the mortgage payments for it. (Feb. 23, 2016 Tr. Vol. I at 130-34; Tr. Vol. II at 237-38.) She testified that her retirement accounts through Scotts and Merrill Lynch originated prior to the marriage and the vast majority of the contributions in the Scotts account (the largest

account with a total value around $300,000) were in place before her marriage to Eichenberger. (Feb. 23, 2016 Tr. Vol. I at 149-50, 157-58.) She admitted that she began working at Cardinal Health in 2010 (and thus would have accrued the Cardinal Health 401(k) during the marriage). (Feb. 23, 2016 Tr. Vol. II at 252.) However, she asserted that her husband had opened a credit card in her name without her permission, hidden assets under other names, and refused to divulge records regarding his businesses. (Feb. 23, 2016 Tr. Vol. I at 149, 159-60; Tr. Vol. II at 201-12, 233-36.) Thus, she testified that although she did not think the court could accurately make an equal division of the assets, she was asking the court for an equitable distribution. (Feb. 23, 2016 Tr. Vol. I at 161-62.)

{¶ 32} With respect to the dog, Cooper, Irvin testified that Cooper was a present for their daughter when she got good grades in middle school. (Feb. 23, 2016 Tr. Vol. I at 137-38; Tr. Vol. II at 257-58.) Although Irvin acknowledged that Eichenberger took care of the dog to some degree, she said it was their daughter's dog and Irvin had paid all expenses associated with the dog. *Id.*

{¶ 33} Irvin's testimony confirmed that Eichenberger had not complied with court orders. He had not generally paid the share of expenses that he was ordered to pay including the $200 monthly payments ordered by agreement of the parties. (Feb. 23, 2016 Tr. Vol. II at 213-15 (testifying that Eichenberger never paid his share of expenses, only paid the agreed $200 on a few occasions and even then never on time).) *See also* July 10, 2015 Agreed Mag. Order at 2. Irvin testified that Eichenberger had not paid for half of their daughter's school, sports, tests, or college application expenses. (Feb. 23, 2016 Tr. Vol. II at 222-29.) She testified that he had not paid the attorney fee awards previously ordered by the court and that Eichenberger did not provide records for his businesses, his accounts, the value of his collections, or his contributions to the household. (Feb. 23, 2016 Tr. Vol. II at 217-18, 240-48.) Irvin further testified that because of Eichenberger's excessive filings and failures to comply with court orders in the divorce litigation, she had expended $18,686.69 in attorney fees and more than $7,000 for the forensic accountant to attempt to piece together Eichenberger's finances. (Feb. 23, 2016 Tr. Vol. II at 220-21, 292-95.) She testified to owing $5,447.41 in unpaid attorney fees. (Feb. 23, 2016 Tr. Vol. II at 220.)

No. 16AP-657

{¶ 34} Eichenberger testified that his income from side businesses like his series of Christian books and sports refereeing was minimal to non-existent. (Feb. 23, 2016 Tr. Vol. III at 347-50.) He asserted that income from his law practice is also modest and that he only netted $9,520 for the 2015 tax year. (Feb. 23, 2016 Tr. Vol. III at 356-57.) He admitted that Red Foot Racing Stables is a business he uses as an asset-sheltering vehicle. (Feb. 23, 2016 Tr. Vol. III at 352-53.) He stated that his law office does not have a general account and that he used his IOLTA account and Red Foot Racing Stables as operating accounts. (Feb. 23, 2016 Tr. Vol. III at 420-28.) He disputed his obligation to pay for ACT college testing for his daughter and did not think it appropriate that he help pay for the college application process since he felt his daughter had left him out of it. (Feb. 23, 2016 Tr. Vol. III at 396-99.) Eichenberger admitted that he had never paid for the house or household expenses, testifying that because Irvin made more money than he did, he instead helped pay for things like vacations for the two of them, gifts at Christmas, entertainment, and "extensive" visits to see Eichenberger's grandchildren from a former marriage. (Feb. 23, 2016 Tr. Vol. III at 355-56.) Nonetheless, he testified that he wanted the house and if he could not have it, he wanted it to be sold and the proceeds divided. (Feb. 23, 2016 Tr. Vol. III at 388-89, 392.)

{¶ 35} In the course of representing himself at trial, Eichenberger discussed discovery orders with the trial court. He maintained that he already had complied with discovery orders. (Feb. 23, 2016 Tr. Vol. I at 165-66, 168-71.) Yet at one juncture during the trial, the trial court ordered Eichenberger to produce checking account statements for Red Foot Racing Stables, statements for his IOLTA account, Social Security statements, and settlement statements for cases settled by his law firm in 2015. (Feb. 23, 2016 Tr. Vol. III at 380-81; Mar. 18, 2016 Case Management Order.) The court adjourned the trial from March 17 until April 6, 2016 to allow him time to collect the court-ordered documents. But when trial resumed on April 6, Eichenberger had still apparently not fully obtained or disclosed the documents ordered by the trial court. (Feb. 23, 2016 Tr. Vol. III at 386-87, 455-60.) Eichenberger admitted he had not met the deadline to purge himself of contempt as ordered February 17, 2016 because he had not read the decision and entry. (Feb. 23, 2016 Tr. Vol. I at 163-69; Feb. 17, 2016 Decision & Entry.) The reason he had not read it, he said, was that he was planning to object to it. (Feb. 23, 2016

No. 16AP-657

Tr. Vol. I at 163.)   On March 2, 2016, during one of several periods in which trial was adjourned, Eichenberger filed objections to the February 17, 2016 contempt decision. (Mar. 2, 2016 Objs.)

{¶ 36} The parties delivered closing arguments on May 9 and also filed trial briefs. (Feb. 23, 2016 Tr. Vol. III at 520-33; Apr. 5, 2016 Eichenberger Trial Brief; Apr. 29, 2016 Irvin Memo. Reply to Def.'s Trial Brief.)

{¶ 37} On September 7, 2016, the trial court issued a divorce decree.  (Sept. 7, 2016 Divorce Decree.)  The decree rendered equitable rather than equal division of the marital property.  It declined to grant Eichenberger a share of the house in light of the proof that he paid nothing toward obtaining or maintaining it, had engaged in financial misconduct, and refused to comply with court orders requiring him to disclose the extent of his own assets.  *Id.* at 7-10.  After taking into account the prior QDRO and deducting unsatisfied temporary orders, attorney fees, and expert fees, it ordered a distribution to Eichenberger of $5,357.82.  *Id.* at 11-19.  It also ordered division of the Social Security assets of the parties.  *Id.* at 22.  It awarded the dog to Irvin.  *Id.* at 11.  In the final relevant portion of its decree, the trial court overruled Eichenberger's objections to the February 17, 2016 decision wherein he had been held in contempt and found that he had failed to purge it; he was ordered to serve three days in jail.  *Id.* at 25-26.

{¶ 38} Eichenberger now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 39} Despite the fact that this Court denied Eichenberger's motion for leave to file a brief in excess of the 60-page limit set by local rule, Eichenberger has filed a 62-page brief (not including 17-pages of front matter and certificate of service) in contravention of Loc.R. 8(B) of the Tenth District Court of Appeals. Because Irvin has not objected, we elect, in our discretion, not to strike Eichenberger's brief.   Eichenberger asserts 13 assignments of error:

> [1.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION IN PURPORTING TO DIVIDE THE SOCIAL SECURITY BENEFITS OF THE PARTIES AS A MARITAL ASSET.
>
> [2.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FAILING

No. 16AP-657

TO CONTINUE THE FIRST SCHEDULED DAY OF TRIAL ON FEBRUARY 22, 2016.

[3.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FINDING THAT THE DEFENDANT HAD BEEN GUILTY OF FINANCIAL MISCONDUCT.

[4.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FINDING THAT THE DEFENDANT HAD NOT COMPLIED WITH DISCOVERY ORDERS OF THE COURT AND HAD FAILED TO DISCLOSE ASSETS.

[5.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY AWARDING ATTORNEY'S FEES AND EXPERT WITNESS FEES TO THE PLAINTIFF IN THEIR ENTIRETY FOR EACH CLASS OF ITEM.

[6.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FAILING TO FIND THE PLAINTIFF IN CONTEMPT OF COURT AND BY FAILING TO ENFORCE ITS COUNSELING ORDER CONCERNING COUNSELING BETWEEN THE MINOR CHILD, [ ], AND THE DEFENDANT.

[7.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FAILURE TO PROPERLY VALUE AND CORRESPONDINGLY AWARD AN EQUITABLE SHARE OF THE MARITAL PORTION OF THE REAL AND PERSONAL FINANCIAL ASSETS OF THE MARRIAGE TO THE DEFENDANT.

[8.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FAILING TO AWARD CUSTODY OF THE PET DOG OF THE PARTIES/COOPER TO THE DEFENDANT OR BY FAILING TO AWARD JOINT CUSTODY OF THE PET DOG TO EACH PARTY.

[9.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FINDING THE DEFENDANT IN CONTEMPT OF COURT BY ENTRY OF AND BY CORRESPONDINGLY FINING THE DEFENDANT THE AMOUNT OF $ 500 WITHOUT HEARING AND WITHOUT PERMITTING THE DEFENDANT TO PURGE ANY CONTEMPT.

[10.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION IN THE DIVORCE DECREE BY SENTENCING THE DEFENDANT TO THREE DAYS IN JAIL FOR CONTEMPT FOR AN ALLEGED FAILURE TO ABIDE BY A DISCOVERY ORDER, AND BY CLAIMING THAT THE DEFENDANT HAD UNTIMELY OBJECTED TO A MAGISTRATE'S REPORT CONCERNING THE SAME ISSUE.

[11.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY FAILING TO AWARD THE NON-FINANCIAL ACCOUNT PERSONAL PROPERTY OF THE PARTIES AND HOUSEHOLD GOODS AND FURNISHINGS IN THE DIVORCE DECREE.

[12.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION BY ORDERING THE DEFENDANT TO VACATE THE MARITAL RESIDENCE OF THE PARTIES IN JANUARY OF 2016.

[13.] THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT AND ABUSED ITS DISCRETION IN FAILING TO CREDIT MONEY PAID BY THE DEFENDANT TO THE PLAINTIFF DURING THE PENDENCY OF THE DIVORCE CASE.

## III. DISCUSSION

### A. Standard of Review

{¶ 40} We have previously explained the standard by which we review dispositions of marital property as follows:

A domestic relations court enjoys broad discretion in fashioning a division of marital property, and its decision will not be reversed absent an abuse of that discretion. *Kaechele v. Kaechele* (1988), 35 Ohio St.3d 93, 95, 518 N.E.2d 1197. The term "abuse of discretion" connotes more than an error of law or judgment; rather, it implies that the court's attitude was unreasonable, arbitrary or capricious. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140. A reviewing court may not substitute its judgment for that of the trial court unless, considering the totality of the circumstances, the trial court abused its discretion. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597. A court should not review discrete aspects of a property division out of the context of the entire award. *Baker v. Baker* (1992), 83 Ohio App.3d 700, 702, 615 N.E.2d 699. Rather, a court should consider whether the trial

> court's disposition of marital property as a whole resulted in a
> property division which was an abuse of discretion. *Id.*

*Hamad v. Hamad*, 10th Dist. No. 06AP-5167, 2007-Ohio-2239, ¶ 54. We have held that " 'no court has the authority, within its discretion, to commit an error of law.' " *JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18, quoting *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7. Thus, we review Eichenberger's assignments of error for abuse of discretion but, to the extent they bear on questions of law, we review such legal questions de novo.[5]

1. **First Assignment of Error—Whether the Trial Court Erred in Ordering Division of the Social Security Benefits of the Parties**

{¶ 41} The Supreme Court has explained:

> In general, pension and retirement benefits acquired by a spouse during the marriage are deemed marital assets that are subject to division. *Erb v. Erb* (1996), 75 Ohio St.3d 18, 20, 661 N.E.2d 175. Social Security benefits share many of the attributes of pension and retirement benefits, yet they are characterized differently under federal law.
>
> Specifically, Section 407(a), Title 42, U.S.Code, forbids any transfer or assignment of Social Security benefits and, in general, protects these benefits from "execution, levy, attachment, garnishment, or other legal process." The United States Supreme Court has construed similar statutory language relative to other retirement benefits to mean that the benefits may not be divided in a divorce proceeding. *See, e.g.*, *Hisquierdo v. Hisquierdo* (1979), 439 U.S. 572, 99 S. Ct. 802, 59 L. Ed. 2d 1 (railroad retirement benefits); *McCarty v. McCarty* (1981), 453 U.S. 210, 101 S. Ct. 2728, 69 L. Ed. 2d 589 (military retirement pay); *Mansell v. Mansell* (1989), 490 U.S. 581, 109 S. Ct. 2023, 104 L. Ed. 2d 675 (military disability benefits). The crux of these decisions is that federal law, which prohibits the division of these assets, prevails over state law, based upon the Supremacy Clause of the United States Constitution, Clause 2, Article VI, United States Constitution.

---

[5] There are some cases which suggest that manifest weight is a standard of review to utilize in some aspects of a domestic relations case. *See, e.g.*, *Hamad* at ¶ 56, 61; *Mantle v. Sterry*, 10th Dist. No. 02AP-286, 2003-Ohio-6058, ¶ 31. However, since many of those cases were decided, the Supreme Court has clarified that even in civil cases, sufficiency and weight are separate questions. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 8-23. Given that clarification, it is apparent that there are conceptually separable questions as to whether the evidence is sufficient and whether it is weighty enough to justify a trial court's exercise of discretion. Thus, post *Eastley*, it appears that both sufficiency and weight are potentially appropriate avenues of inquiry.

No. 16AP-657

> In other words, federal law preempts state law that would authorize distribution of these benefits. *Hisquierdo.*

(Footnote omitted.) *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 6-7. In *Neville*, the Supreme Court went on to conclude that while Social Security benefits may not be divided, "[i]n making an equitable distribution of marital property in a divorce proceeding, a trial court may consider the parties' future Social Security benefits in relation to all marital assets." *Id.* at syllabus.

{¶ 42} We agree that the trial court erred legally in ordering division of the parties' Social Security assets. We sustain Eichenberger's first assignment of error.

### 2. Second Assignment of Error—Whether the Trial Court Abused its Discretion in Failing to Continue the First Day of Trial

{¶ 43} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981).

> In evaluating a motion for a continuance, a court should note, inter alia: [1] the length of the delay requested; [2] whether other continuances have been requested and received; [3] the inconvenience to litigants, witnesses, opposing counsel and the court; [4] whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; [5] whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and [6] other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68.

{¶ 44} The following discussion occurred in connection with Eichenberger's request for a continuance:

> MR. EICHENBERGER: Your Honor, I would like to move for a continuance of this trial at this time.
>
> First of all, addressing the lack of discovery issue, I took Ms. Irvin's oral deposition at my office last Thursday. She was at my office, and she did appear.
>
> I was under the impression at that time that my oral deposition was also going to be taken, and at that time, [Irvin's Counsel] declined to do that. Last Wednesday, for the first time, I was given probably over a hundred pages of new documents in this case.
>
> That was in response to a request to produce documents that I had filed a new request to produce documents in this case.

No. 16AP-657

They were on a flash drive by category, which made it very hard to go through them since the documents really had to be opened up individually on the flash drive to look at those.

Last Wednesday, for the first time, the existence of an expert witness was disclosed to me for the financial statements in this case. Or the financial information that is in this case, and I would like the opportunity to also orally depose that expert witness.

As also for failing to disclose documents to [Irvin's Counsel], she did receive a response to several different requests to produce documents. She has those documents. They were written interrogatories that were answered in the case by myself.

There has been discovery that was responded to in this case and I'm asking for an additional 30 days, Your Honor, so that I could look at the new information that I was given and so I can orally depose the expert witness of the Plaintiff.

And if [Irvin's Counsel] needs further information from me, she issued a subpoena in this case. She did not take the opportunity to take my oral deposition last Thursday. She has had lots of opportunities to have information in this case, Your Honor.

[IRVIN'S COUNSEL]: May I respond?

THE COURT: You may.

[IRVIN'S COUNSEL]: Thank you.

First of all, I emailed Mr. Eichenberger specifically requesting the name and contact information of his court reporting service that he had selected to use for that deposition so that I might contact that court reporter and ask if that court reporter had time to take an additional deposition, was even willing to be there past a certain time for a deposition.

He failed to produce any of that information to me despite my repeated request.

I never noticed or filed a notice of deposition of Mr. Eichenberger with this court. He was never formally noticed to appear anywhere for a deposition. Why he thinks I wanted to do that, I don't know. I had mentioned that I would like.

No. 16AP-657

THE COURT: Counsel, we all know you don't have to take a deposition if you don't want to, so we don't have to belabor that point.

[IRVIN'S COUNSEL]: Thank you.

Second, he has had ample opportunity to conduct depositions in this case. This divorce complaint was filed back in December of 2014. Certainly, in that time, he could have taken my client's deposition. When we were back in your chambers for a conference a while ago, you instructed to get a financial expert on the case, which we did immediately thereafter. In fact, when we were in your chambers, I informed both you and Mr. Eichenberger who that expert was going to be. So he's been on notice for months of this expert witness.

We timely delivered our trial notebook to him via electronic submission on -- it was actually Tuesday that it was left for him at his office. He, then, said that he would pick up the box of hard copy documents at our office yesterday. He did not show up to pick those up so I brought them to court with me today.

So there is no reason to delay this trial. We are prepared to go forward. The expert is here ready to testify. This is all accounting for the most part.

THE COURT: Accounting of what?

[IRVIN'S COUNSEL]: Of the retirement accounts, the assets of the marriage, that's what [the forensic accountant] has put together for the Court. She's prepared to go through those, identify what's separate property and what is not, discuss issues of financial misconduct when there has likely been concealment of certain assets of Mr. Eichenberger that he's failed to produce, which the Court is well aware can go to my client's favor on the net distribution at the end.

So we are prepared to go forward and put that testimony on. There has been ample opportunity in this case to depose whomever he would like. Waiting until a few days before trial starts to do that is not justification for a continuance. Thank you.

MR. EICHENBERGER: Your Honor, I would like to briefly respond to that. I would vehemently disagree that I knew the identity of the Plaintiff's expert witness until last Wednesday

No. 16AP-657

when I read a document on the flash drive that was given to me. I didn't know.

It was never previously identified in this case to me. Plus, I don't know of any court in Franklin County than won't give at least one continuance on a case, Your Honor.

I simply have not had time to try to develop this case due to my own office schedule and due to the lack of information and just obtaining information in the case that was new last Wednesday. Thank you.

THE COURT: I'm very disinclined to grant a continuance on a case that was filed in December of 2014, because this case has been before the magistrate several times on discovery issues. There's been orders issued by the magistrate, motions to compel discovery filed in November of '15, that the magistrate ruled upon actually admonishing both of you to exchange discovery. I think I was more than abundantly clear that I would be doing this case today.

MR. EICHENBERGER: That was exchanged, Your Honor, on the discovery. I would like to make that point, too. She has been given and was given all the documents that I have.

In fact, she issued subpoenas which I was only served with back in -- at the end of December, right around Christmastime and January, in which she requested more information.

THE COURT: There is an ongoing duty to disclose discovery. As the case goes on, there is an ongoing duty. But you two have been having the discovery battle since this case was filed.

MR. EICHENBERGER: I would like 30 days, and I think that's fair and reasonable.

THE COURT: I don't think so because on December 4, I specifically said this case will go to trial today. I gave a date for trial notebooks to be exchanged, for witness lists to be included, and I also included on December 2, that a business evaluation needed to be done, if you chose to do so, before today.

MR. EICHENBERGER: Your Honor, not granting one continuance in a case is a severe abuse of discretion, and I don't think that it's unreasonable --

No. 16AP-657

THE COURT: That's a legal decision -- a conclusion that you're trying to draw and I don't hardly think that if you take this to the Tenth District after this trial that they will find it to be an abuse of discretion because this case has been before me ad nauseam throughout 2015.

MR. EICHENBERGER: I don't think--

THE COURT: I was very clear that we would start trial today.

MR. EICHENBERGER: I don't think it's unusual, Your Honor, to ask for one continuance. And asking for a continuance of 30 days is certainly reasonable and fair to me. It would be grossly unfair not to do that.

THE COURT: It would be grossly unfair to Ms. Irvin, also, who has brought all these documents, had her trial notebook prepared, has an attorney here, has a business evaluator here for a contested trial date that I gave you December 2. And today is February 23. You knew it was going to go today, Mr. Eichenberger.

MR. EICHENBERGER: I did not know. I want 30 days, Your Honor.

THE COURT: No.

MR. EICHENBERGER: Really? That's an abuse of discretion, Your Honor.

THE COURT: Well, the Tenth District will make that decision if you take it up.

MR. EICHENBERGER: They will have the opportunity to do that, Your Honor.

THE COURT: So I will not grant a continuance after this last time. I told you in December it was a firm trial date.

MR. EICHENBERGER: We have never had a continuance, Your Honor.

THE COURT: It is firm.

MR. EICHENBERGER: We have never had one. This is the first trial date that was set in this case.

No. 16AP-657

THE COURT: On a case that is over a year old. I will not grant a continuance today.

(Feb. 23, 2016 Tr. Vol. I at 5-13.)

{¶ 45} Applying the *Unger* factors, Eichenberger only requested 30 days; thus, the delay sought was short. But prior to Eichenberger's request on the first day of trial, by our count (not including simple auto-scheduling docket entries), various aspects of this case were continued a total of 10 times, 5 of which were at the express request of Eichenberger. (Dec. 7, 2015 Continuance; Nov. 3, 2015 Continuance; Oct. 26, 2015 Continuance; Sept. 3, 2015 Continuance; Aug. 11, 2015 Continuance; June 10, 2015 Continuance; June 9, 2015 Continuance; Apr. 28, 2015 Continuance; Apr. 1, 2015 Continuance; Jan. 30, 2015 Continuance.) As the colloquy quoted above shows, Eichenberger's last-minute request for a continuance would have caused inconvenience to the other parties, witnesses, and the court. The request may have been intentionally dilatory but was, at a minimum, a result of Eichenberger's failure to prepare for trial and cooperate in discovery. Thus at least three, and possibly four, of the *Unger* factors weighed against granting the continuance. *Unger* at 67-68.

{¶ 46} We do not find an abuse of discretion here, and we overrule Eichenberger's second assignment of error.

### 3. Third Assignment of Error—Whether the Trial Court Erred in Concluding that Eichenberger had Engaged in Financial Misconduct

{¶ 47} The Ohio Revised Code defines "financial misconduct" as "including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets." R.C. 3105.171(E)(4). In this case, there was ample evidence, even from Eichenberger himself, that he engaged in, at a minimum, the "concealment" and "nondisclosure" of assets. The forensic accountant presented evidence that Eichenberger had a coin collection, a baseball card collection, a PNC account, a PNC safe deposit box, a PayPal account, an irrevocable living trust, a revocable living trust, a potential interest in a trust maintained by his mother, and two closely held businesses, Red Foot Racing Stables, LLC and his law practice. (Feb. 23, 2016 Tr. Vol. I at 42, 84-88; Pl.'s Ex. 3 at 1, 3.) However, because Eichenberger had not disclosed records sufficient to value any of these assets, Irvin's forensic accountant was not able to use them in her calculations of the parties' assets. *Id.* She also testified that there was evidence of $1,246 in expenditures by

Eichenberger on golf packages and some $19,881 in discretionary non-business expenditures from Red Foot Racing Stables, which suggested financial misconduct by Eichenberger ("dissipation" of assets during the pendency of the divorce). (Feb. 23, 2016 Tr. Vol. I at 99-105; Pl.'s Ex. 3 at 4.) Eichenberger testified that Red Foot Racing Stables is a business he uses as an asset-sheltering vehicle. (Feb. 23, 2016 Tr. Vol. III at 352-53.) He said his law office does not have a general account and that he used his IOLTA account and Red Foot Racing Stables as operating accounts. (Feb. 23, 2016 Tr. Vol. III at 420-28.)

{¶ 48} We see no abuse of discretion in the finding that Eichenberger engaged in financial misconduct, and we overrule Eichenberger's third assignment of error.

### 4. Fourth Assignment of Error—Whether the Trial Court Erred in Finding that Eichenberger had Not Complied with Discovery Orders of the Court by Failing to Disclose Assets

{¶ 49} Throughout the trial, Eichenberger maintained that he already had complied with discovery orders. (Feb. 23, 2016 Tr. Vol. I at 165-66, 168-71.) However, on February 17, 2016, the trial court issued a decision and entry based on a hearing that had occurred on December 15, 2015. Based on evidence produced during the hearing, the trial court on February 17, 2016 concluded that Eichenberger had not complied with the June 4, 2015 order compelling him to properly answer discovery requests from Irvin. (Feb. 17, 2016 Decision & Entry at 3.) The trial court ordered him to serve three days in jail for contempt but gave him the opportunity to purge the contempt. The contempt was to have been purged if, on or before February 22, 2016 at 10 a.m., Eichenberger paid $600 to Irvin to cover her fees and costs (which could be satisfied through an offset against a final distribution) and appropriately responded to discovery by addressing each and every document identified in the prior order and producing that which lay within his possession and control. *Id.* At trial, however, Eichenberger admitted he had not met the deadline to purge himself of contempt as set forth in the February 17, 2016 decision and entry because he had not read it. (Feb. 23, 2016 Tr. Vol. I at 163-69; Feb. 17, 2016 Decision & Entry.) The reason he had not read it, he said, was that he was planning to object to it. (Feb. 23, 2016 Tr. Vol. I at 163.)

{¶ 50} In addition, at one juncture during the trial, the trial court gave Eichenberger a chance to prove that he could comply with discovery orders when it ordered Eichenberger to produce various documents and then adjourned the trial from

No. 16AP-657

March 17 until April 6 to allow him time to collect the necessary documents.  (Feb. 23, 2016 Tr. Vol. III at 380-81; Mar. 18, 2016 Case Management Order.)   Yet, when trial resumed on April 6, the following colloquy occurred:

> [The Court:]   Mr. Eichenberger, you have been found in contempt on several occasions for not providing discovery * * * .
>
> MR. EICHENBERGER: Your Honor, I would like to respond very briefly. I knew this expert witness existed six days prior to trial. She never asked me for any information, and I probably would have provided her, I'm sure, any information that she wanted, but I didn't know the lady existed.
>
> I would have liked, prior to trial, the opportunity to orally depose this woman, and with the six-day disclosure of who this lady was, I wasn't given that opportunity. So I kind of resent the statements that I didn't provide things specifically for her because --
>
> THE COURT: You didn't provide anything for this Court. I ordered you in a case management order to bring in 12 months of your bank statements and have them here by March 28 to opposing counsel.
>
> MR. EICHENBERGER: They were given to [Irvin's Counsel], Your Honor. Everything you ordered in the case management order was produced.
>
> THE COURT: You testified you didn't produce any of those documents or introduce any of those documents to back up any of your claims about your income, your assets or anything else.
>
> MR. EICHENBERGER: Your Honor, I think, Your Honor, I produced them for [Irvin's Counsel]. If she wished to use them or not, that's her decision, but they were produced. Your case management order was complied with and I think the information --
>
> THE COURT: You have the 12 months of bank statements?
>
> [IRVIN'S COUNSEL]: No, Your Honor.
>
> MR. EICHENBERGER: She has had them in her possession from a previous production, Your Honor.

No. 16AP-657

THE COURT: No. I ordered you to bring in 2015. The documents that she asked questions about today were from 2013.

MR. EICHENBERGER: Those statements were provided. They were available. Whether they should be exhibits for this trial is really up to [Irvin's Counsel].

Quite frankly, and I apologize if I'm wrong, I thought I was producing all these things for [Irvin's Counsel], and they were provided for her. She had them.

THE COURT: I think the testimony of Ms. Irvin was they got these documents by subpoena.

MR. EICHENBERGER: Ms. Irvin doesn't know what I produced in the past week and a half or two weeks because they weren't sent to her. They were sent to counsel.

[IRVIN'S COUNSEL]: He just testified today that he did not produce these for me, and that, in fact, I retrieved these by subpoena.

MR. EICHENBERGER: No. Those were the documents we're previously talking about.

THE COURT: Okay.

MR. EICHENBERGER: I'm tired of the misrepresentations.

THE COURT: It is not a misrepresentation that you have been found in contempt for failure to comply with discovery. That's not a misrepresentation.

MR. EICHENBERGER: Talking about the case management order. That is because it was complied with.

THE COURT: Do you have copies of what you gave her?

MR. EICHENBERGER: I certainly do, Your Honor.

THE COURT: Where are they?

MR. EICHENBERGER: I will have to dig them out. They are here and they weren't introduced as exhibits. She wasn't interested in doing that.

No. 16AP-657

> THE COURT: Twelve months of bank statements, sir, and the statements that I requested of the breakdown of the settlement of your cases; do you have them?
>
> MR. EICHENBERGER: Are we going to use those as exhibits and admit them?
>
> THE COURT: Do you have them?
>
> MR. EICHENBERGER: I have those things, Your Honor.
>
> THE COURT: I want the entire year.
>
> MR. EICHENBERGER: Are we going to introduce them as exhibits?
>
> THE COURT: Do you have them?
>
> MR. EICHENBERGER: I produced the Red Foot checking records for [Irvin's Counsel]. I didn't bring those along today. [Irvin's Counsel] has them.
>
> THE COURT: [Irvin's Counsel], do you have 12 months of Red Foot Racing?
>
> [IRVIN'S COUNSEL]: No, Your Honor.

(Feb. 23, 2016 Tr. Vol. III at 455-59.)

{¶ 51} We discern no error in the trial court's conclusion that Eichenberger had failed to comply with discovery orders regarding his assets. We overrule Eichenberger's fourth assignment of error.

### 5. Fifth Assignment of Error—Whether the Trial Court Erred in Awarding Attorney Fees and Expert Witness Fees

{¶ 52} The Ohio Revised Code provides:

> In an action for divorce * * * a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

R.C. 3105.73(A). Eichenberger argues that awarding attorney fees and expert fees ("litigation expenses") in this case was "outrageous and ludicrous" due to bias by the trial judge. (Dec. 28, 2016 Eichenberger Brief at 42-49.). He also argues that the award

No. 16AP-657

amounts to a double penalty because the attorney fees had already been paid by Irvin from resources in which he otherwise would (he argues) have shared. *Id.*

{¶ 53} However, his claims of bias were repeatedly rejected by the Supreme Court. (Dec. 9, 2015 Disqualification Aff., filed Dec. 16, 2015; Dec. 11, 2015 Jgmt. Entry, filed Dec. 16, 2015; Dec. 15, 2015 Am. Disqualification Aff., filed Dec. 21, 2015; Dec. 30, 2015 Jgmt. Entry, filed Jan 4, 2016.) Thus, the fee award was not inappropriate for that reason.

{¶ 54} Eichenberger is correct that Irvin paid her attorney and that this had the effect of diminishing resources that might otherwise have been subject to consideration for division. Thus, Eichenberger is correct to note that in some circumstances, an award of fees is a layered penalty against a party in a divorce because the amount spent on an attorney is both not available for division and also then subtracted from any award to the spouse against whom fees are assessed. However, Eichenberger fails to cite (nor have we found) any case, rule, or statute which suggests that this is not exactly what the legislature intended when they passed R.C. 3105.73(A), investing a trial court with discretion to award fees and litigation expenses in a divorce action.

{¶ 55} Eichenberger's fifth assignment of error is overruled.

**6. Sixth Assignment of Error—Whether the Trial Court Erred By Failing to Find Irvin in Contempt for her Failure to Force the Parties' Teenage Daughter to Attend Counseling with Eichenberger**

{¶ 56} On April 27, 2015, the trial court ordered the parties' daughter, who was then 17, to attend counseling with Eichenberger. (Apr. 27, 2015 Entry.) Approximately six months after the initial counseling order, Eichenberger filed a motion for contempt against Irvin based on Irvin's failure to effectively force their daughter to attend counseling sessions with Eichenberger. (Oct. 26, 2015 Mot. for Contempt.) However, the original April 27, 2015 order had not expressly obligated Irvin to take any action to ensure that the parties' daughter attended counseling, thus, the trial court denied the motion for contempt against Irvin. (Feb. 17, 2016 Decision & Entry at 4-5.)

{¶ 57} We discern no error here. Eichenberger's sixth assignment of error is overruled.

### 7. Seventh Assignment of Error—Whether the Trial Court Failed to Properly Value the Assets of the Parties and Award an Equitable Share to Eichenberger

{¶ 58} REAL PROPERTY

{¶ 59} Eichenberger argues that the trial court improperly failed to recognize that he had a valid interest in the house on Pegasus Court. (Eichenberger Brief at 55-58.) However, that is not an accurate reading of the divorce decree. The trial court agreed in its divorce decree with Eichenberger's interpretation of the case law on dower interests, recognizing that he held a valid interest in the house (notwithstanding testimony that he never paid a cent toward its purchase and maintenance). (Sept. 7, 2016 Decree at 4-7.) But in the exercise of the trial court's discretion, it found that Eichenberger had committed financial misconduct and awarded Eichenberger's interest in the property to Irvin as a matter of equity.[6] *Id.* at 7-10.

{¶ 60} RETIREMENT ACCOUNTS

{¶ 61} Eichenberger argues that the trial court abused its discretion in valuing the retirement accounts and assigning them as either marital or separate property. (Eichenberger Brief at 58-61.) We agree in some respects.

{¶ 62} The court assigned a value of approximately $20,874.05 to the Cardinal Health Wells Fargo 401(k) account and counted it as separate property of Irvin. (Sept. 7, 2016 Decree at 18.) However, Irvin herself testified that this account was accumulated entirely during the marriage. (Feb. 23, 2016 Tr. Vol. II at 252.) Thus, it should have been considered marital property according to R.C. 3105.171(A)(3) and (6) (defining "marital property" and "separate property" respectively). The trial court's finding that it was separate property was unsupported by the evidence in the record and was error.

{¶ 63} But as for the values for the Merrill Lynch accounts, they were taken directly from the testimony and report of Irvin's expert. (Pl.'s Ex. 3 at 3; Sept. 7, 2016 Decree at 18.) We do not perceive an error in the trial court's use of those amounts.

{¶ 64} The trial court valued the Scotts Fidelity 401(k) at $308,332.85 from which it then calculated Eichenberger's distribution. (Sept. 7, 2016 Decree at 18.) However, the

---

[6] The trial court described this as a "distributive award" which was not technically correct since it considered the house to be mostly marital property and a "distributive award" is defined in the Ohio Revised Code as payments "made from separate property or income, and that are not made from marital property." R.C. 3105.171(A)(1).

No. 16AP-657

amount held in the 401(k) does not appear in the record before this Court including the transcript.[7] Irvin's forensic accountant testified to another number, and at trial, the parties frequently made reference to tabs in binders. But these binders were not admitted by the trial court into evidence except for certain enumerated exhibits. Thus, if the figure is from one of the binders but not an exhibit, it is not before this Court. The remaining figures in the trial court's calculation appear to be correctly drawn from the report and testimony of the expert and the procedural history of the case. *See* Sept. 7, 2016 Decree at 18-19; Pl.'s Ex. 3; Feb. 23, 2016 Tr. Vol. I at 61. However, as the starting figure does not appear in the record, we cannot find that the $308,332.85 is supported by the evidence. Accordingly, we agree with Eichenberger that error exists.

{¶ 65} BANK ACCOUNTS

{¶ 66} Eichenberger also contests the trial court's conclusion that bank accounts held in the name of each party were to be retained by each party. (Eichenberger Brief at 61-62.) The trial court in its decree did not specifically say whether it was considering such accounts separate or marital property that it was awarding to each party respectively on an equitable basis rather than making division. While perhaps it would have been helpful for the trial court to have explained its reasoning, Eichenberger does not present any argument as to why it was inequitable or an abuse of discretion for the trial court to have chosen to award each account to its holder.

{¶ 67} BONDS

{¶ 68} Eichenberger finally argues that the trial court had a duty to consider the savings payable on death bonds to be marital property purchased by Irvin for the benefit of the couple's child and to equitably divide the values. (Eichenberger Brief at 64.) A review of the divorce decree reveals that except for bonds purchased for Irvin's son from a prior marriage, the trial court did treat the bonds as marital property. (Sept. 7, 2016

---

[7] The trial court in its decree states that the fair market value of the Scotts Fidelity 401(k) is $308,332.85. (Sept. 7, 2016 Decree at 18.) The accountant valued it at $330,564, consistent with the final account statement in plaintiff's exhibit 20. (Feb. 23, 2016 Tr. Vol. I at 56; Pl.'s Ex. 3 at 3.) Irvin testified at trial, however, that the account was subject to adverse market fluctuations. Thus, she said "I checked a week or so ago, and it was down to $308,000." (Feb. 23, 2016 Tr. Vol. I at 152.) Irvin's number is close to the dollar number used in the decree. But the exact amount used by the trial court does not appear in the record including the transcript. The parties may have used materials at trial that either were not admitted or preserved for review on appeal. But we have no means of verifying the accuracy of the dollar amount used by the trial court without evidence of it in the record.

No. 16AP-657

Decree at 20.) But as a matter of equity, the trial court elected to distribute them to Irvin presuming they will continue to remain, payable on death for the benefit of the couple's daughter. *See* R.C. 3105.171(C) and(E). We perceive no error here.

{¶ 69} Eichenberger's seventh assignment of error is overruled in part and sustained in part as set forth in this decision.

### 8. Eighth Assignment of Error—Whether the Trial Court Erred by Failing to Award the Pet Dog, "Cooper," to Eichenberger

{¶ 70} Evidence adduced at trial showed that both Eichenberger and Irvin cared for the dog in both practical and emotional senses of the term and that the dog was adopted/purchased during the marriage. (Feb. 23, 2016 Tr. Vol. II at 257-58; Tr. Vol. III 367-69.) However, the dog was a gift for their child when she received good grades and, by Eichenberger's own admission, his daughter no longer has any relationship with Eichenberger. (Feb. 23, 2016 Tr. Vol. I at 138; Eichenberger Brief at 53.) It appears the trial court recognized that awarding the dog to Eichenberger would be tantamount to causing emotional pain to the child. And from a financial perspective, only Irvin paid for the dog's adoption and expenses. (Feb. 23, 2016 Tr. Vol. III at 368-69.) The trial court did not err in deciding, as a matter of equity, that the dog should remain in Irvin's home where the couple's daughter resided.

{¶ 71} Eichenberger's eighth assignment of error is overruled.

### 9. Ninth Assignment of Error—Whether the Trial Court Erred in Finding Eichenberger in Criminal Contempt Without a Hearing or Giving him an Opportunity to Purge the Contempt

{¶ 72} This Court has previously summarized the varieties of contempt:

> There are several types of contempt: direct, indirect, civil, criminal, and summary. The fundamental distinction between direct contempt and indirect contempt lies in the location of the act of contempt—whether it takes place within the presence of the judge, or elsewhere. "A direct contempt is one committed in the presence of or so near the court as to obstruct the due and orderly administration of justice." *In re Lands*, 146 Ohio St. 589, 595 (1946). "It is said that direct contempt takes place in the presence of the court, and indirect contempt is all other contempt." *Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 202 (1973). Summary contempt is related to direct contempt and is the finding of contempt where no hearing is required by due process because the judge has personal knowledge of the contumacious act, and the act

No. 16AP-657

> constitutes an imminent threat to the administration of justice. *In re Oliver*, 333 U.S. 257, 274-76 (1948); *Cooke v. United States*, 267 U.S. 517, 534 (1925). Finally, the answer to the question "what does the court primarily seek to accomplish by imposing sentence?" will determine whether a contempt is civil or criminal. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911).

*A.P. Lee & Co. v. R.R. Bowker, LLC*, 10th Dist. No. 14AP-599, 2015-Ohio-2535, ¶ 31.

{¶ 73} In this case, the trial court summarily found Eichenberger in direct contempt and fined him $500. (Feb. 4, 2016 Entry at 2-3.) According to the order, Eichenberger's contumacious act was committed directly in the trial court's presence when he simply walked out of an ongoing hearing in order to obstruct and delay the court's proceedings. *Id.* In such cases, no hearings are required because the judge has personal knowledge of the contumacious act and no further evidence is required. *A.P. Lee* at ¶ 31.

{¶ 74} Nor was the trial court required to give Eichenberger the opportunity to purge his contempt. Civil contempt consists of punishment levied generally to force the contemnor to do something the contemnor had erstwhile refused to do, but criminal contempt is merely punishment for conduct injurious to the court process. Thus, it is only "the civil contemnor, unlike the criminal contemnor, [who] must be allowed the opportunity to purge." *In re Caron*, 110 Ohio Misc.2d 58, 101 (C.P. 2000), citing *State v. Kilbane*, 61 Ohio St.2d 201, 206-07 (1980); *Carroll v. Detty*, 113 Ohio App.3d 708, 710 (4th Dist.1996). In other words, the opportunity to purge is an opportunity for the civil contemnor to do what is requested rather than face punishment. The criminal contemnor has no such opportunity because nothing is sought of him—the punishment levied in criminal contempt cases is merely retributive and intended to deter further transgressions against the court. In this instance, the trial court sought nothing of Eichenberger. Its decision makes clear that it simply intended to punish him for his inappropriate conduct

No. 16AP-657

of walking out mid-hearing. (Feb. 4, 2016 Entry at 2-3.) This was therefore an instance of summary direct criminal contempt and no opportunity to purge was required.[8]

{¶ 75} We overrule Eichenberger's ninth assignment of error.

### 10. Tenth Assignment of Error—Whether the Trial Court Erred in Requiring Eichenberger to Spend Three Days in Jail as a Result of Unpurged Civil Contempt

{¶ 76} On February 17, 2016, the trial court issued an entry finding Eichenberger in contempt and ordering him to produce certain documents and agree to be responsible for certain amounts by February 22, 2016 in order to purge the contempt. (Feb. 17, 2016 Decision & Entry at 2-4.) During trial, Eichenberger admitted he had not met the deadline to purge himself of contempt as set forth in the February 17, 2016 decision because he had not read it. (Feb. 23, 2016 Tr. Vol. I at 163-69; Feb. 17, 2016 Decision & Entry.) The reason he had not read it, he said, was that he was planning to object to it. (Feb. 23, 2016 Tr. Vol. I at 163.) He did, in fact, file objections on March 2, 2016. (Mar. 2, 2016 Objs.)

{¶ 77} Timely objecting to a magistrate's decision under Civ.R. 53 results in an automatic stay unless the trial court, in adopting the decision, finds that immediate relief is justified and makes the decision an interim order. *See* Civ.R. 53(D)(4)(e)(i) and (ii). Here, the trial court's adoption of the February 17, 2016 magistrate decision did not designate it an interim order or find that immediate relief was justified. (Feb. 17, 2016 Decision & Entry at 1.) *See also* Civ. R. 53(D)(4)(e)(ii). Thus the timely filing of objections stayed the order.

{¶ 78} The trial court did not rule on or dispose of the objections until the decree of divorce was entered in the record. In the decree, the trial court stated that Eichenberger's objections were not timely because they were filed on March 23, 2016. (Sept. 7, 2016 Decree at 25-26.) But our review of record, specifically the trial court's docket, indicates that Eichenberger's objections were timely filed on March 2, 2016. (Mar. 2, 2016 Objs.) S*ee also* Civ.R. 53(D)(3)(b)(i) (requiring that objections be filed within 14 days). We hold that the trial court committed error when it concluded in its decree that Eichenberger had

---

[8] To the extent that Eichenberger may be understood to argue that he did not walk out mid-hearing in complete disregard of the court process and with intention to disrupt proceedings, we note that no transcript of this hearing has been preserved.

failed to purge his contempt as ordered and should face jail without first considering the merits of his timely filed objections.

{¶ 79} We sustain Eichenberger's tenth assignment of error.

### 11. Eleventh Assignment of Error—Whether the Trial Court Erred in Failing to Divide and Award Personal Property and Household Goods

{¶ 80} The trial court remarked in its decree of divorce that Eichenberger is entitled to possession and title over the personal property, household goods, and furnishings set forth in "Exhibit 1" to the decree. (Sept. 7, 2016 Decree at 11.) However, no Exhibit 1 was attached. Because of this, we sustain Eichenberger's eleventh assignment of error.

### 12. Twelfth Assignment of Error—Whether the Trial Court Erred when it Ordered Eichenberger to Vacate the Pegasus House

{¶ 81} The magistrate, in a February 19, 2015 order, denied Irvin's motion for exclusive use of the Pegasus residence reasoning that "to be successful on her motion and have Defendant ordered to vacate the marital residence, Plaintiff credibly must prove that she has been subject to physical violence by Defendant, that Defendant poses a credible threat of imminent physical violence to her, or that Defendant has or will be destructive to the parties' real or personal property if allowed to remain in the residence." (Feb. 19, 2015 Mag. Order at 1.) Eichenberger argues that because Irvin never produced proof of any of those three categories of harm (or threatened harm), the trial court should not subsequently have granted Irvin exclusive use of the house on Pegasus Court. (Eichenberger Brief at 71-75; Dec. 7, 2015 Decision & Entry at 2-3.) However, the three categories listed by the magistrate in the February 19, 2015 order are not categories of proof required by law. Rather, they appear to relate more to the equitable powers of the court as set forth in R.C. 3105.011 concerning the needs of the parties and their minor child.

{¶ 82} During the hearing on Irvin's second motion for exclusive use of the Pegasus residence, evidence was adduced about how the relationship between Eichenberger and his minor daughter had deteriorated (she lived at the house on Pegasus Court during the pendency of the case). Although this evidence did not address the concerns the magistrate expressed in connection with Irvin's first motion, the magistrate and the trial court within the proper exercise of the court's equitable powers recognized other

concerns, such as for the parties' daughter, that were implicated by Eichenberger's continued presence in the house in granting Irvin's second motion. In short, the trial court was not obligated to follow the same reasoning in addressing the second motion on different evidence. (Dec. 1, 2015 Hearing Tr. at 19-20, filed Jan. 22, 2016; Dec. 7, 2015 Decision & Entry at 2-3.) Though Eichenberger argues that his daughter was shortly to become an adult at the time he was forced to leave the Pegasus residence, she was a high school student and there was no evidence that she did not plan to live in her mother's house until she left to attend college or begin a career. We discern no abuse of discretion in ordering Eichenberger to vacate the marital residence during the pendency of the divorce case when there was evidence that his presence and conduct was causing emotional distress to the minor child who dwelt there, notwithstanding the fact that the child was to obtain majority shortly after Eichenberger moved out.

{¶ 83} Eichenberger's twelfth assignment of error is overruled.

### 13. Thirteenth Assignment of Error—Whether the Trial Court Improperly Failed to Credit Money Allegedly Paid by Eichenberger to Irvin During the Pendency of the Case

{¶ 84} Eichenberger argues that the trial court improperly failed to credit the $200 payments he made to Irvin during the pendency of the case for living expenses. (Eichenberger Brief at 76-77.) The court awarded a total offset of $5,880 against his distribution of marital assets, arising from the expenses he was ordered to pay by the July 10, 2015 agreed order. (Sept. 7, 2016 Decree at 13.) This amount matches the amount calculated by the forensic accountant but neither the trial court's nor the accountant's calculation includes any payments made by Eichenberger. (Feb. 23, 2016 Tr. Vol. I at 106-07[9]; Pl.'s Ex. 3 at 4.) Irvin argues in her brief that the calculation should have been $6,860. (Irvin Brief at 31.)

{¶ 85} Eichenberger had agreed to an offset of $490 per month from December 30, 2014 until July 31, 2015 and to pay Irvin $200 in cash on the first of each month with the understanding that the remaining $290 of monthly expenses for each month after August 1, 2015 would accrue and offset against Eichenberger's final share of the assets.

---

[9] We note that the accountant mistakenly testified at trial that taxes were included in the $5,880 figure, which may account for some confusion. (Feb. 23, 2016 Tr. Vol. I at 106-07.) But the accountant was clear about the fact that no $200 payments from Eichenberger had been counted. *Id.*

No. 16AP-657

(July 10, 2015 Agreed Mag. Order at 1-2.)  While the trial court never directly vacated any part of the agreed order, the entry in December 2015 modified existing temporary orders effective January 1, 2016, and only continued the obligation by Eichenberger to pay $133 per month toward the credit card debts.  (Dec. 7, 2015 Decision & Entry at 2-5.)  Thus Eichenberger was not required to pay $490 (or $200+$290) after December 2015, and the forensic accountant's calculation does not include any payments after December 2015. (Feb. 23, 2016 Tr. Vol. I at 106-07.)

{¶ 86}  In short, in early January 2016, the total amount for expenses accrued under the July 10, 2015 agreed order (assuming Eichenberger made no payments of $200) would have been $5,880.[10]  Yet, Irvin testified that Eichenberger had paid her installments of $200 on at least some occasions.  (Feb. 23, 2016 Tr. Vol. II at 213-15.)  It appears that neither the trial court nor the accountant considered Eichenberger's payments.

{¶ 87}  We therefore sustain Eichenberger's thirteenth assignment of error.

IV.  CONCLUSION

{¶ 88}  The trial court could not legally divide social security assets; the trial court's figures and designations of some retirements are not supported in the record with either documentary evidence or testimony; the order holding Eichenberger in contempt dismissed as untimely without being considered on its merits, since it was timely; the referenced schedule of personal property is not attached to the divorce decree; and the trial court did not take into account certain payments (which undisputed testimony shows were made) in determining the offset to apply when dividing the parties' assets. Accordingly, we sustain Eichenberger's first, tenth, eleventh, and thirteenth assignments of error, and we sustain in part and overrule in part Eichenberger's seventh assignment of error.  The decree of divorce issued by the trial court is reversed in the parts indicated above and otherwise affirmed.  We overrule Eichenberger's second, third, fourth, fifth, sixth, eighth, ninth, and twelfth assignments of error.  This case is remanded for further

---

[10] $490*7{Jan., Feb., Mar., Apr., May, June, July 2015}+($200+$290)*5{Aug., Sept., Oct., Nov., Dec. 2015}=$5,880

No. 16AP-657

proceedings consistent with this opinion to the Franklin County Court of Common Please, Division of Domestic Relations, Juvenile Branch.

*Judgment reversed in part,*
*affirmed in part, and cause remanded.*

KLATT, J., concurs.
DORRIAN, J. concurs in part.


DORRIAN, J., concurring in part.

{¶ 89} I respectfully concur in judgment only with the majority as to the thirteenth assignment of error. I concur with the majority as to the remaining assignments of error.

———————————————