[Cite as *Iske v. Iske*, 2017-Ohio-8717.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Cynthia S. Iske, | : | |
| Plaintiff-Appellee, | : | No. 17AP-215 |
| v. | : | (C.P.C. No. 15DR-4321) |
| Randy G. Iske, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 28, 2017

**On brief:** *Harry Lewis Co., LPA*, and *Gregg R. Lewis*, for appellee. **Argued:** *Gregg R. Lewis.*

**On brief:** *Kokensparger Ryan Legal Group*, *Steven J. Kokensparger*, and *Corinne N. Ryan*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BRUNNER, J.

{¶ 1} Defendant-appellant, Randy G. Iske, appeals from a February 22, 2017 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, issuing a decree of divorce and dividing assets of the parties. The parties concede, and we agree, that the trial court erred in considering Randy's[1] Oppenheimer Funds to be both a separate asset and a marital asset. Thus we sustain the second assignment of error. We also agree that the trial court's order that the parties "equalize[]" retirement accounts, including Social Security, is ambiguous. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 22.) However, we construe that statement as dictating that Social Security accounts are not to be divided and should only be considered for the purposes of dividing plaintiff-appellee's,

---

[1] Because the parties share the same last name, for ease of reference we refer to them by first name.

Cynthia S. Iske, State Teachers Retirement System ("STRS") pension. Hence we sustain in part and overrule in part Randy's third assignment of error. We find no merit in Randy's remaining two assignments of error and overrule them. Based on our disposition of the assignments of error, we reverse the decree of the trial court in part and direct that the trial court modify its decree to treat Randy's Oppenheimer Funds as a separate asset and enforce its decree in regard to retirement accounts with the understanding that Social Security accounts are not to be divided and may only be considered for the purposes of dividing a public pension. In all other respects, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   On November 20, 2015, Cynthia filed a complaint for divorce against her husband, Randy. (Nov. 20, 2015 Compl.) The parties were able to resolve many of their differences by agreement and stipulation. Nearly a year later, on October 31, 2016, the trial court held a bench trial on unresolved issues. According to stipulations executed immediately prior to trial, the issues to be resolved by trial were the value of a family farm property in Iowa, the relative separate property interests of each party in the marital residence on Kul Circle, and the termination date of the marriage (which would affect the division of bank accounts and retirement accounts). (Oct. 31, 2016 Pretrial Stip. at 4-5, filed Nov. 1, 2016.)

{¶ 3}   Three witnesses testified at the October trial; Cynthia, Randy, and their son, Nicholas Iske. (Tr., filed Apr. 25, 2017.) In addition to the live testimony, the parties submitted the deposition testimony of two stipulated experts on the likely value of the farmland owned jointly by the parties. (Van Zee Dep., filed Oct. 24, 2016; Smith Dep., filed Oct. 28, 2016.) We review the testimony of these witnesses as is relevant to the issues contested in this appeal.

{¶ 4}   Cynthia testified first. She testified that she and Randy were married on June 24, 1995. (Tr. at 8.) She moved out of the marital residence on May 8, 2016 and rented an apartment. (Tr. at 12-13.) She testified that moving out and ending the marriage was entirely her decision and that there were no attempts at reconciliation. (Tr. at 17-19, 27.) She admitted that she and her husband had discussed counseling and that each party had offered to engage in counseling at one point in time. (Tr. at 28.) However, the offers took place at different times and, in each instance, when one of them was ready to engage

in counseling, the other was not. *Id.* She testified that she was not seeing anyone else but had stopped socializing with her husband by fall 2015. (Tr. at 17, 19.)

{¶ 5} On the topic of finances, she testified consistent with the pretrial stipulation that she had her own retirement that was funded from her own earnings. (Tr. at 26-27; Pretrial Stip. at 4.) Neither her testimony nor the stipulation expressly indicated whether she could expect to receive Social Security distributions in retirement. She testified that the Iowa farm property deed indicates that she and Randy owned it as joint tenants. (Tr. at 21; *see also* Smith Dep., Ex. 6, filed Oct. 28, 2016.) In her testimony she agreed that although she owned a house on Maidens Larne Drive prior to the marriage, that Randy paid the mortgage on the property once they moved in together and that they both invested money in the house in the form of renovations. (Tr. at 23-24.) She therefore admitted that the $16,782.60 proceeds from the sale of the Maidens Larne house (which were used to buy their current marital residence on Kul Circle) were marital property. (Tr. at 24-25; Pl. Ex. 3.)

{¶ 6} Randy confirmed that he and Cynthia were married on June 24, 1995. (Tr. at 38.) He testified that he considered his marriage over the day his wife told him it was, at the end of August 2015. (Tr. at 93.) He said that he offered to do counseling with her, but she told him she had already made up her mind that it was over. (Tr. at 93-94.)

{¶ 7} Randy testified that when he and Cynthia bought a house on Kul Circle, he took $22,731.38 from his premarital account with Oppenheimer Funds, and contributed that to the down payment. (Tr. at 42; Def. Ex. C.) He testified that after his wife moved out, he paid off the mortgage on the Kul Circle property. (Tr. at 70-72.) He testified that the money used to pay off the mortgage came entirely from his work earnings. (Tr. at 91.)

{¶ 8} With respect to the Iowa property, Randy explained that his father had owned 320 acres of farmland in Iowa. (Tr. at 49.) His father divided it up into four parcels of approximately 80 acres and gave one parcel to Cynthia and Randy jointly and one parcel apiece to each of Randy's three brothers. (Tr. at 50.) The parties stipulated that if their 80 acres were sold, $30,000 would go to Randy's brother, Michael, because that brother had taken on the responsibility of working the farmland in order to satisfy certain loans originally obtained by Randy's father. (Tr. at 54.) Randy also testified that a sum of money would have to be paid to his mother to pay her for the remainder of her life estate in the

property. (Tr. at 53-54.) When one of Randy's other brothers, Alfred, sold his 80 acres, he was compelled to fund an annuity to pay his mother $700 per month for 10 years. (Tr. at 53-55.) Randy stated that if the property were sold, he would have to compensate his mother according to the same terms. (Tr. at 58.) In addition, he explained (and his son, Nicholas Iske, confirmed) that Randy agreed to pay his sister $50,000 from the proceeds of any sale as a matter of fairness, since she had been left out of the original gift of farmland. (Tr. at 63-64, 77-79.) Randy and Nicholas also testified that Cynthia was aware of this agreement and had not evinced disagreement with it. (Tr. at 61-62, 80.)

{¶ 9} The first expert to testify, by way of deposition, was John Van Zee, a real estate sales associate with Farmers National Company. (Van Zee Dep. at 7.) He testified that he did a market analysis with comparable sales in order to arrive at an appropriate price per acre per Corn Suitability Rating point (CSR1).[2] *Id.* at 13-14; *see also* Van Zee Dep., Ex. 1, filed Oct. 24, 2016. Comparable sales for a market analysis consisted of nearby recent actual sales of cropland, discounted where appropriate to avoid counting proceeds related to non-crop land or buildings. (Van Zee Dep. at 16-18; Van Zee Dep., Ex. 1 at 1.) Using this analysis, Van Zee calculated an average price of $100.52 per CSR1 point per acre. (Van Zee Dep., Ex. 1 at 1.) He multiplied this by the 71.1 tillable acres contained within Randy and Cynthia's property and the CSR1 rating for the land (65.1) to obtain a value of $465,278. *Id.* at 2. To this he also added a figure for the 6.9 acres of timbered land included within the property at an estimated value of $2,000 per acre. *Id.* Thus his total forecasted market value for the land was $479,078. *Id.* The market value estimate did not include any value for buildings on the land. *Id.* He testified that the estimate was not an appraisal (which would have also included an income and cost approach) but solely an opinion as to the likely market price the land would fetch. (Van Zee Dep. at 21; Van Zee Dep., Ex. 1 at 2.)

{¶ 10} The second expert to testify by deposition was Ken Smith, an attorney who assists in farmland transactions and owns one-third interest in a 7,413-acre farming operation in Ukraine. (Smith Dep. at 5-6, 42, 50.) Smith also testified as a fact witness because he was one of the attorneys who was involved in the negotiation of Randy's

---

[2] Van Zee admitted that, effective in January 2016, CSR1 was replaced by CSR2, which takes into account improvements in land production due to improved tilling, terracing, seed technology, herbicides, and other technology. (Van Zee Dep. at 19.) He testified, however, that CSR2 values are higher, and thus, if anything, his price forecast would be heightened by the use of CSR2 figures. *Id.* at 19-20, 48-49.

mother's life estate and the sale of part of the original 320 acres by Randy's brother, Alfred. *Id.* at 6-30. Smith explained that the farm was transferred in four parcels to the four brothers due to debt trouble incurred by the parents but that the parents had intended to reserve a life estate for themselves. *Id.* at 6-14. Due to an error by another attorney however, the life estate was not properly reserved. *Id.* at 12-14. Thus there was some litigation and negotiation after Randy's father died when the first brother sought to sell his 80 acres. *Id.* at 14-16. Smith confirmed that Randy's brother Michael had farmed the land and helped pay off the debt on the farm and that Michael had received payment from Alfred on the sale of Alfred's land. *Id.* at 20-21. Smith also confirmed that an annuity was created from Alfred's sale of his parcel in favor of Randy's mother in exchange for a quit-claim of her interest in Alfred's 80 acres. (Smith Dep. at 41; Smith Dep., Exs. 4-5.) He opined that a similar claim would be made if Randy and Cynthia were to sell their parcel. (Smith Dep. at 41.) Smith also confirmed that some of the brothers have agreed to make a payout to their sister on sale of the land due to the fact that she was otherwise left out of the original land gift. (Smith Dep. at 48-49.)

{¶ 11} On the topic of estimated value, Smith testified that the Iske farm is worth $280,000. *Id.* at 40; Smith Dep., Ex. 7. He explained that it is a "rolling" farm, the contours and borders of which make it less valuable to potential mega farm purchasers. (Smith Dep. at 32-41.) Smith testified, moreover, that based on sales he had recently participated in, he thought prices had lately dropped. *Id.* at 43-44; *see also* Smith Dep., Ex. 7. But he could not recall any specifics of the sales that he had participated in that led him to believe prices had fallen in the area. (Smith Dep. at 54-56.) He was also not definite about whether his $280,000 figure took account of the life estate and other debts and agreements related to the property. *Compare Id.* at 40-41 *with* Smith Dep., Ex. 7.

{¶ 12} Following closing briefs by the parties, the trial court, on January 6, 2017, issued a divorce decree and entry. (Jan. 6, 2017 Decree, Decision, & Entry.) Randy moved for a new trial based on a number of alleged errors in the trial court's decision. (Feb. 3, 2017 Mot. for New Trial.) The trial court declined to grant a new trial, but, due to the presence of a number of clerical errors, the trial court issued an amended decree and entry on February 22, 2017. (Feb. 22, 2017 Am. Decree, Decision, & Entry; Feb. 22, 2017 Decision & Entry Denying Mot. for New Trial.)

{¶ 13} In the amended decree the trial court made a number of rulings relevant to this appeal. It decided that the termination date of the marriage would be the date of the final hearing in the case. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 5-8.) It found that there was insufficient evidence from which to conclude that Randy's payoff of the Kul Circle mortgage was accomplished solely with his separate property. *Id.* at 11. It stated that the Oppenheimer Fund moneys were Randy's separate property but also not his separate property. *Id.* at 10, 21. It listed all the retirement accounts (an unknown amount for Randy's accrued Social Security value, $8,778.34 for Cynthia's STRS accrued value, nothing for Cynthia's Social Security accrued value, and various accrued value account totals for the privately-held accounts) and then directed that, "the plans shall be equalized between the parties." *Id.* at 22. It found Van Zee's analysis more credible than Smith's and adopted his CSR1 valuation of $479,078. *Id.* at 16. The trial court also decided that Randy's brother (Michael) and his sister were due $30,000 and $50,000, respectively, from any proceeds. *Id.* at 16-19. Finally, the trial court concluded that Randy's mother had a life estate interest in the property similar to the interest recognized when Alfred sold his 80 acres and that, of the 10 years estimated for her life estate when Alfred sold his property, 53 months remained on the farm property owned by Randy and Cynthia. *Id.* The trial court found the obligation owed to Randy's mother to buy her interest in the property to be $700 per month for 53 months, or $37,100. *Id.* The trial court calculated the remaining marital value of the Iowa farmland to be $361,978, and it ordered Randy to pay the sum of $180,989 to Cynthia within 18 months or on the sale of the property, whichever occurred first. *Id.* at 19-20.

{¶ 14} Randy now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Randy asserts four assignments of error for review:

> [1.] THE TRIAL COURT ERRED IN ITS DETERMINATION OF THE *DE FACTO* DATE OF DIVORCE FOR PURPOSES OF PROPERTY DIVISION.
>
> [2.] THE TRIAL COURT ERRED IN TREATING APPELLANT'S PRE-MARITAL ACCOUNTS AS MARITAL EVEN AFTER THE COURT HAD DETERMINED THE VERY SAME ACCOUNTS TO BE THE SEPARATE PROPERTY OF THE APPELLANT IN OTHER SECTIONS OF THE DECREE.

[3.] THE TRIAL COURT ERRED IN INCLUDING APPELLANT'S SOCIAL SECURITY RETIREMENT CONTRIBUTIONS IN THE RETIREMENT ACCOUNTS WHICH WERE TO BE "NETTED OUT".

[4.] THE TRIAL COURT ERRED IN ADOPTING ITS OWN FORMULA FOR DETERMINING THE LEGAL AND ECONOMIC VULNERABILITY OF THE PARTIES IN THE POTENTIAL SALE OF THE IOWA PROPERTY RATHER THAN RELYING UPON THE TESTIMONY OF THE EXPERT WITNESSES.

(Emphasis sic.)

## III.  DISCUSSION

### A.  Standard of Review

{¶ 16} We have previously explained the standard for reviewing a trial court's disposition of marital property:

> A domestic relations court enjoys broad discretion in fashioning a division of marital property, and its decision will not be reversed absent an abuse of that discretion. *Kaechele v. Kaechele* (1988), 35 Ohio St.3d 93, 95, 518 N.E.2d 1197. The term "abuse of discretion" connotes more than an error of law or judgment; rather, it implies that the court's attitude was unreasonable, arbitrary or capricious. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140. A reviewing court may not substitute its judgment for that of the trial court unless, considering the totality of the circumstances, the trial court abused its discretion. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597. A court should not review discrete aspects of a property division out of the context of the entire award. *Baker v. Baker* (1992), 83 Ohio App.3d 700, 702, 615 N.E.2d 699. Rather, a court should consider whether the trial court's disposition of marital property as a whole resulted in a property division which was an abuse of discretion. *Id.*

*Hamad v. Hamad*, 10th Dist. No. 06AP-516, 2007-Ohio-2239, ¶ 54.

{¶ 17} Notwithstanding the overarching standard of review, previous decisions of this Court support the view that it is legitimate for an appellate court to review factual determinations of the trial court for manifest weight and sufficiency.  *Hamad* at ¶ 56, 61; *Mantle v. Sterry*, 10th Dist. No. 02AP-286, 2003-Ohio-6058, ¶ 31; *see also Irvin v. Eichenberger*, 10th Dist. No. 16AP-657, 2017-Ohio-5601, ¶ 40, fn. 5.  Furthermore, this

Court has frequently remarked that " 'no court has the authority, within its discretion, to commit an error of law.' " *JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18, quoting *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7. Thus, we review the distribution of assets for abuse of discretion, we review individual factual determinations for manifest weight and sufficiency, and we review questions of law de novo.

### B. First Assignment of Error — Whether the Trial Court Erred in Refusing to Find a De Facto Termination Date

{¶ 18} Ohio statute defines the period of a marriage as follows:

> (2) "During the marriage" means whichever of the following is applicable:
>
> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;
>
> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

R.C. 3105.171(A)(2)(a) and (b).

{¶ 19} Neither party contests the fact that the marriage began on June 24, 1995, nor is there dispute as to the date of the "final hearing" in this matter. Rather, Randy argues that the court erred and abused its discretion when it failed to find an earlier de facto termination date with the result that he was deprived of 50 percent of the benefit of the Kul Circle mortgage payoff. (Randy's Brief at 15-25.) That is, because he paid off the mortgage after his wife moved out and he believed the marriage to be over (but before the final hearing) Randy argues that such portion of the home's value should be considered his separate property. *Id.*

{¶ 20} The Supreme Court of Ohio has instructed courts that the law for determining the duration of marriage for the purpose of asset division must stand the test of fairness on review:

> The choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations. The public policy giving rise to equitable distribution is at least in part an acknowledgment that marriage is a shared enterprise or joint undertaking. While marriage is literally a partnership, it is a partnership in which the contributions and equities of the partners do differ from individual case to individual case. Assets acquired by the joint efforts of the parties should be, on termination, eligible for distribution. But the precise date upon which any marriage irretrievably breaks down is extremely difficult to determine, and this court will avoid promulgating any unworkable rules with regard to this determination. It is the equitableness of the result reached that must stand the test of fairness on review.

*Berish v. Berish*, 69 Ohio St.2d 318, 319-20 (1982).  Additionally, we have focused on a variety of factors to consider on a case-by-case basis.  *Rogers v. Rogers*, 10th Dist. No. 96APF10-1333, 1997 Ohio App. LEXIS 4033, *11-17 (Sept. 2, 1997) (describing cases).  One factor is that the de facto termination of a marriage should be mutual; this avoids the inequitable result of one party unilaterally engineering an advantageous termination date for the division of assets.  *Farley v. Farley*, 10th Dist. No. 99AP-1103, 2000 WL 1231091, 2000 Ohio App. LEXIS 3902, *18-23 (Aug. 31, 2000).

{¶ 21}  Here the trial court recognized evidence from which it could determine a de facto termination date:

> 1. The parties separated on May 8, 2016.
>
> 2. Neither party has or is presently cohabitating since separation.
>
> 3. The parties have ceased intimate relations.
>
> 4. [Cynthia] retained counsel to proceed with a divorce in September, 2015.
>
> 5. The divorce was filed on November 1, 2015.
>
> 6. The parties did not discuss terms for a separation prior to [Cynthia] filing.
>
> 7. The parties essentially maintain[ed] separate finances throughout the marriage with each party's income going to specific obligations.

8. There have been no meaningful attempts at reconciliation prior to the filing of the divorce. Both parties considered counseling, but no counseling ever took place.

9. Neither party is having an extramarital affair.

10. Neither party has taken a vacation with a member of the opposite sex.

11. Neither party has been a host for any joint social get together.

12. The parties finally separated all financial matters as of August, 2016.

13. The parties have similar incomes.

14. The initial commencement of the divorce was a unilateral decision made by [Cynthia] without [Randy's] knowledge or agreement.

(Feb. 22, 2017 Am. Decree, Decision, & Entry at 7-8.) Among those findings, the trial court made observations indicating it would be fair to consider the final hearing date the end date of the marriage pursuant to R.C. 3105.171(A)(2)(a) rather than to name a de facto date. In doing so, the trial court observed that the parties maintained separate finances throughout the marriage and that they have similar incomes. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 7.)

{¶ 22} Upon review, the trial court observed the instruction of *Berish*, that "[i]t is the equitableness of the result reached that must stand the test of fairness on review." *Berish* at 320. And while there was ample evidence in this case to suggest that the marriage was irretrievably on the path to ending before the final hearing, fixing an exact date for de facto termination is (as the *Berish* court noted) "extremely difficult." *Id.* In this case, there was no need to undertake that difficult task because there was no proof that either party would disproportionately suffer (since incomes were relatively equal and the parties kept their assets separate throughout the marriage) if the termination date remained the final hearing date. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 7.)

{¶ 23} Although Randy argues as he did at trial, that his payoff of the Kul Circle house came solely from his earnings and not at all from joint property, his testimony on this matter was somewhat ambiguous. (Randy's Brief at 15-25; Nov. 15, 2016 Randy's

Closing Argument at 2-4.) He testified, for example, that the Huntington account (from which the payoff of the Kul Circle house mortgage came) was funded at least in part from joint accounts that he "managed." (Tr. at 65-72; Pl. Exs. 9, 11, 28.) And it is not clear from Randy's testimony or the bank records that the approximately $20,000 transferred from the Huntington account to pay off the Kul Circle mortgage came entirely from wages earned by Randy after a point where the marriage had broken-down irretrievably.

{¶ 24} The trial court's factual findings were supported by the evidence and not manifestly against its weight. In applying *Berish* to the trial court's findings, we find the trial court fairly reached an equitable result for the parties in determining the marriage termination date pursuant to R.C. 3105.171(A)(2)(a), and thus, we find no abuse of discretion. Randy's first assignment of error is overruled.

### C. Second Assignment of Error – Whether the Trial Court Erred in Treating Randy's Oppenheimer Funds as Both Separate and Marital Property

{¶ 25} On page 10 of its amended decree and entry, the trial court referred to Randy's Oppenheimer accounts as separate property. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 10.) On page 21 it found, based on a disputed balance sheet filed with the parties' pretrial stipulations, that the parties had a balance in the Oppenheimer account ending in 4609 of $26,648.30 of which $4,372.00 was Randy's separate property. *Id.* at 21; Pretrial Stip. Randy argues, and Cynthia concedes, that this was error, that the balance sheet was disputed, and that the Oppenheimer accounts were Randy's separate property. (Cynthia's Brief at 17.)

{¶ 26} Randy's second assignment of error is sustained.

### D. Third Assignment of Error – Whether the Trial Court Erred in Considering Randy's Social Security but not Cynthia's in Making Division of Assets

{¶ 27} An Ohio common pleas court is not empowered to order the division of Social Security assets but, "[i]n making an equitable distribution of marital property in a divorce proceeding, a trial court may consider the parties' future Social Security benefits in relation to all marital assets." *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 6-11, syllabus; *accord Irvin* at ¶ 41. An Ohio statute, enacted several years after *Neville*, provides that a court may consider, "[a]ny retirement benefits of the spouses, excluding the social

security benefits of a spouse except as may be relevant for purposes of dividing a public pension." R.C. 3105.171(F)(9) (division (F)(9) first effective April 7, 2009).

{¶ 28} Randy now argues that the trial court erred in considering his Social Security retirement when it did not also consider Cynthia's, and asks that we order the trial court to only consider his Social Security contributions for the years in which Cynthia was not also contributing to Social Security and was instead accumulating a public pension. (Randy's Brief at 29.) But, although Cynthia apparently worked for some time in a job (Nationwide Children's Hospital) in which she likely would have contributed to the Social Security system, we do not find in the record any evidence of her contributions to Social Security or some indication that is entitled to receive benefits at some future date. This apparent deficiency of the record is corroborated by the trial court's statement in denying Randy's motion for a new trial:

> [Cynthia's] social security benefits were not provided in evidence. However, [Randy's] Social Security Benefits were included on the Balance Sheet filed November 1, 2016. [T]he Court cannot consider information that is not provided to the Court at the time of trial.

(Feb. 22, 2017 Decision & Entry on Motion for New Trial at 3.)

{¶ 29} "Appellate review is limited to the record as it existed at the time the trial court rendered its judgment." *Wiltz v. Clark Schaefer Hackett & Co.*, 10th Dist. No. 11AP-64, 2011-Ohio-5616, ¶ 13 (collecting cases). The trial court could only consider evidence before it in reaching its conclusions in a trial based on the evidence. The trial court did not abuse its discretion in failing to consider evidence that was not presented.

{¶ 30} Randy also argues that the trial court erred when it ordered the parties to "equalize[]" all the retirement plans because that might be understood to require division of his Social Security or the use of it for a purpose other than "dividing a public pension." (Randy's Brief at 29; Randy's Reply Brief at 5-6); R.C. 3105.171(F)(9). That is, the trial court listed all the retirement accounts—an unknown amount for Randy's Social Security, $8,778.34 for Cynthia's STRS, nothing for Cynthia's Social Security, and various account totals for all the privately held accounts in each of their names. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 22.) Then the trial court directed that "the plans shall be equalized between the parties." *Id.* We recognize that there may exist ambiguity in the trial court's

directive to the extent it could be construed to imply that Randy's Social Security is to be divided or considered other than for the purpose of dividing Cynthia's STRS. R.C. 3105.171(F)(9).

{¶ 31} Sometimes court judgments require interpretation by the same or another court.

> If the words and language in a judgment or decree are free of ambiguity, and appear to express clearly and plainly the sense intended, there is no need to resort to other means of interpretation. *Rohr v. Williams*, 7th Dist. No. 06 MA 171, 2007-Ohio-7207, ¶ 21. "An ambiguous order is one that is unclear or indefinite and is subject to more than one rational interpretation." *Id.* at ¶ 22. "If the language is ambiguous, then the trial court has broad discretion when clarifying that ambiguous language." *Id.* If a judgment is susceptible to two possible interpretations, we must adopt the interpretation which gives effect to the judgment in its entirety without eliminating part of the judgment. *Ward v. Ward*, 13 Ohio App.3d 302, 303, 13 Ohio B. 368, 468 N.E.2d 1132 (10th Dist.1983).

*Murphy v. Murphy*, 10th Dist. No. 12AP-1079, 2013-Ohio-5776, ¶ 37; *see accord Scheel v. Rock Ohio Caesars Cleveland, L.L.C.*, 8th Dist. No. 105037, 2017-Ohio-7174, ¶ 17. Although the court's directive could be construed broadly and as being inapposite to the proscription of dividing Social Security assets expressed in *Neville* and in R.C. 3105.171(F)(9), we interpret it to be that Randy's Social Security is to be considered solely for the purpose of dividing Cynthia's STRS.

{¶ 32} Randy's third assignment of error is overruled in part and sustained in part so as to give full effect to the trial court's judgment.

### E. Fourth Assignment of Error — Whether the Trial Court Erred in its Valuation of the Iowa Farm Property

{¶ 33} The trial court made the factual finding that Van Zee's analysis was more credible than Smith's and adopted Van Zee's valuation of the Iowa farmland, subject to the court's factual findings concerning deductions necessary for debts or payments owed to Randy's brother, mother, and sister. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 16-20.) Randy argues that the trial court erred in not finding Smith more credible than Van Zee because Smith was familiar with the land in question and was not biased in favor of high values. (Randy's Brief at 32.) Randy argues that because Smith is an attorney who

earns most of his income from practice and Ukrainian farm ownership, Smith has little incentive to inflate estimates, as opposed to Van Zee who earns his income from sales of Iowa farmland. *Id.* Randy also argues Van Zee did not take into account debts and payments to Randy's brother, mother, and sister that diminish the overall value of the property. *Id.* at 33-35. Randy argues the trial court's valuation was speculative. *Id.*

{¶ 34} The parties stipulated that both Van Zee and Smith were experts. (Pretrial Stip. at 5.) Van Zee was transparent about the method of his valuation, stating that he determined the value of the land by calculating the average cost per acre per CSR1 point for five comparable nearby recent sales. (Van Zee Dep. at 16-18.) He provided detailed information about the recent sales including what was sold, for how much, when, and by what means. *Id.*; Van Zee Dep., Ex. 1 at 1. He determined the value of the subject property by multiplying CSR1 score by tillable acres by average regional price per acre and added an estimated amount for each acre of timbered land to arrive at a value of $479,078. *Id.* at 2. By contrast, Smith testified generally that the Iske farm was a "rolling" farm and not attractive to mega farm purchasers. (Smith Dep. at 32-41.) His opinion affidavit was based on the sales of two neighboring parcels, extrapolating that the price per acre should be only approximately 60 percent of what Van Zee had calculated. (Smith Dep., Ex. 7.) But Smith was unable to recall any specifics of the two sales which led him to opine on the price per acre. (Smith Dep. at 54-56.) Nor was he definite about whether or not his $280,000 valuation included the life estate and other debts related to the property. *Id.* at 40-41; Smith Dep., Ex. 7. Given this evidence, we cannot find that the trial court lost its way in determining the credibility of these two expert witnesses such that its finding was manifestly against the weight of the evidence.

{¶ 35} The trial court likewise did not err in crediting the parties' stipulation that $30,000 was owed to Randy's brother, Michael. (Tr. at 54.) Based on the consistent testimony of Randy and Nicholas, we do not find that the trial court erred in deducting from its value $50,000 to pay to Randy's sister. (Tr. at 61-64, 77-80.) Nor was it against the manifest weight of the evidence for the trial court to have concluded, based on the deposition testimony of Smith, corroborated by Randy's testimony and exhibits to Smith's deposition that Randy's mother had a life estate in Randy and Cynthia's 80 acres similar to that which was determined when Alfred sold his 80 acres. (Smith Dep., Exs. 3-4; Smith

Dep. at 15-22, 41; Tr. at 58.) Although Randy argues on appeal that his mother's life estate could have changed in value, he testified at trial that, if the Iowa property were sold, he would be required to compensate his mother according to the same terms as his brother, Alfred. (Tr. at 58.) Based on the evidence before the trial court, it was not an abuse of discretion to have multiplied the months left in Randy's mother's ten-year, annuity-based life estate remainder, based on the sale of Alfred's land, by $700 per month and also to have deducted that from the overall value of Randy and Cynthia's farm property. (Feb. 22, 2017 Am. Decree, Decision, & Entry at 19-20.)

{¶ 36} The trial court's findings regarding the Iowa property were supported by sufficient evidence. Its evidentiary findings were not against the manifest weight of the evidence before it. Once the trial court made its factual findings, it fairly adjudged how to divide the parties' assets and did not abuse its discretion under the law. *See Id.* at 16-20. We overrule Randy's fourth assignment of error.

## IV. CONCLUSION

{¶ 37} The trial court followed the law in finding that the parties' marriage ended on the date of the final hearing before it. It did not abuse its discretion in failing to find a de facto termination date for the marriage. As the finder of fact, the trial court's valuation of the Iowa farm property, reliant on the testimony of one expert over the other, was within the court's discretion. Having determined the facts important to valuing the farmland for the purposes of dividing its value between the parties, the trial court fairly determined its value. We interpret the trial court's judgment to give it full effect such that Randy's Social Security assets may be used to offset the distribution from Cynthia's STRS pension. But the trial court's simultaneous consideration of a retirement account in Randy's name as both separate property and marital property must be reversed and remanded to the trial court for correction.

{¶ 38} We therefore sustain Randy's second assignment of error, sustain in part and overrule in part his third assignment of error, overrule his first and fourth assignments of error, and remand the judgment for the Franklin County Court of Common Pleas, Division of Domestic Relation, for further consideration. On remand, we instruct the trial court to modify its decree to treat Randy's Oppenheimer Funds as a separate asset and to enforce its decree on retirement accounts with the understanding that Randy's Social Security

account is not to be divided and should only be considered as may be relevant for purposes of dividing Cynthia's STRS.

*Judgment reversed in part,*
*affirmed in part, and remanded.*

DORRIAN and HORTON, JJ., concur.

———————————